**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 28, 2011

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                                        No. 139856

CHARLES FACKELMAN,

     Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

Defendant was found guilty but mentally ill of home invasion, felonious assault, and felony-firearm, charges that resulted from an altercation he had with Randy Krell, the man who defendant believed had caused the death of his teenage son, Charlie, in an episode of road rage. Defendant perceived Krell to have been unremorseful about his role in the tragedy and antagonistic towards defendant's family during subsequent legal proceedings in which Krell was convicted of only a misdemeanor for his involvement in Charlie's death. The only issue at defendant's trial was whether he was legally insane at the time of the incident. The prosecutor's expert witness opined that he was not, while

defendant's expert opined that he was. Although these expert witnesses were the only doctors who testified at defendant's trial, their opinions regarding defendant's sanity were not the only expert opinions before the jury. Rather, defendant's jury was repeatedly told about the diagnosis of a third expert who was conspicuously absent from defendant's trial-- a psychiatrist unaffiliated with either the prosecution or the defense, and the only doctor to have examined defendant within days of the incident, who, in a report that was reviewed by the other experts but never authenticated and offered into evidence, diagnosed defendant as suffering from "[m]ajor depression, single episode, severe without psychosis." We conclude that the use of this powerful, tiebreaking diagnosis as substantive evidence of defendant's sanity compromised his constitutional right to be confronted with the witnesses against him. Accordingly, we reverse the judgment of the Court of Appeals, vacate defendant's convictions, and remand for further proceedings.

## I. FACTS AND PROCEEDINGS

On June 16, 2006, defendant's teenage son, Charlie, was killed in an automobile accident. Defendant describes the accident as a road rage incident, in which a car driven by Randy Krell allegedly engaged in a high-speed chase that resulted in the crash of another car in which Charlie was a passenger, killing Charlie and rendering another teenage passenger in the same car a paraplegic. The drivers of both vehicles were charged with vehicular manslaughter. The driver of the car in which Charlie was a passenger pleaded guilty to a lesser offense and apologized to defendant's family. Krell opted to go to trial, claiming his innocence. He was convicted of negligent homicide, a misdemeanor, and was sentenced to six months in jail and probation. During the

2

proceedings, defendant perceived Krell as insulting and antagonizing to his family. Krell never apologized.

According to his relatives, friends, and colleagues, defendant experienced a significant change in his mood and behavior after Charlie was killed. Defendant saw a psychologist and was prescribed an antidepressant (Prozac) and an antianxiety medication (Xanax). On March 27, 2007, defendant watched his son's school baseball team play what would have been the first game of Charlie's varsity season. Witnesses described defendant as depressed and uncommunicative at the time. There were several indications that he was thinking of suicide.

The next day, defendant drove to Krell's house with a gun. Krell testified that he saw defendant get out of his car with a gun in his hand and that defendant pointed the gun at his chest and said that the two men had to talk. Krell ran across the street to the home of a neighbor, Thomas Williams, who let Krell in. Defendant kicked in the door and told Williams, "I'm not here for you" but for "him." Krell ran out the back of the house. Someone else called 911. Defendant left in his car and drove to his mother's home in Toledo, Ohio, where he hid the gun in a register and then left.

The police and defendant's family and friends looked for defendant after he left Williams's house. Attorneys who had represented defendant's family were also involved in the search and were in frequent contact with the Monroe County Prosecutor and the police. Eventually, a family friend found defendant at a gas station, approximately 20 miles away near Toledo, Ohio, and drove him to Flower Hospital in Toledo. Defendant was arrested en route to the hospital. One of the lawyers arranged for defendant's

3

admission to the hospital and declined to allow the police to interview him because of his condition. Defendant was taken to a crisis center, where he spent the night.

The next day, defendant was admitted to the psychiatric intensive care unit at Flower Hospital. There, he was examined by Dr. Agha Shahid, who prepared a three-page report on defendant's psychiatric condition on March 30, 2007, two days after the incident. Defendant was prescribed Seroquel, an antipsychotic medication, and remained at Flower Hospital for approximately two weeks.

Defendant claimed to have little recollection of what he did on the day of the incident. He remembered sitting in his car at work in the morning, crying. Witnesses saw defendant curled up in a fetal position in his car, rocking back and forth. The next thing he remembered was a red plastic couch at the crisis center in Toledo. He did not remember going to his mother's home, he did not remember the first couple days of his hospitalization, and he did not remember being interviewed by Dr. Shahid.

Defendant was charged with first-degree home invasion, MCL 750.110a(2), two counts of felonious assault with a dangerous weapon, MCL 750.82, and felony-firearm, MCL 750.227b. He claimed that he was legally insane at the time of the incident on March 28, 2007. The prosecutor presented the expert testimony of Dr. Jennifer Balay, a psychologist who examined defendant at the Michigan Center for Forensic Psychiatry in May 2007. Dr. Balay said that defendant was mentally ill, but she did not think that he was legally insane at the time of the offense. Specifically, she concluded that defendant "was not psychotic at anytime during this depression." Defendant presented the expert testimony of Dr. Zubin Mistry, a clinical psychologist who interviewed defendant on September 4, 2007. Dr. Mistry disagreed with Dr. Balay's assessment. He testified that

4

defendant was legally insane at the time of the offense, concluding that defendant had experienced a "major depressive episode with psychotic features" or a "brief reactive psychosis."

Both Dr. Mistry and Dr. Balay reviewed Dr. Shahid's report in making their determinations regarding defendant's mental state. As the first witness presented by defendant, Dr. Mistry provided the requisite testimony needed for defendant to raise his insanity defense. Dr. Mistry testified that Dr. Shahid's report was one of many sources he had reviewed in reaching his opinion that defendant was legally insane at the time of the incident.[1] In his direct testimony, he never referenced Dr. Shahid's diagnosis, never discussed any other doctor's diagnosis, and testified only as to his own diagnosis.

On cross-examination, the prosecutor's questioning of Dr. Mistry was largely focused on Dr. Shahid, bringing out details about Dr. Shahid's professional credentials

---

[1] Dr. Mistry explained:

> You'll typically interview the individual, extensively observing their behaviors, their mannerisms, their patterns of behavior. You'll talk to individuals involved as witnesses and oftentimes you will talk to spouses, et cetera, people familiar with their functioning and their level of functioning. You'll do an assessment of their pre-morbid functioning, which is the way that they responded and functioned in a time frame . . . prior to the event you're dealing with. . . . You'll review medical records from individuals who have been treating, practioners, hospital records. You'll also review any prior records of . . . mental conditions. You'll take some family history as to mental conditions. And you do a broad range of assessment of the individual. . . .
>
> * * *
>
> I reviewed records from Flower Hospital, Dr. Shahid's records, Dr. Indurti had provided some records. . . . [And] at least a couple of other counselors.

5

("He's an M.D., psychiatrist, correct?") and Dr. Shahid's prior relationship to Dr. Mistry ("Do you know Dr. Shahid?" "You respect his opinion, correct?"). At the end of this cross-examination, the prosecutor squarely placed Dr. Shahid's diagnosis before the jury:

> *Q.* At the end of that report did you read Dr. Shahid's diagnosis?
>
> *A.* Yeah.
>
> *Q.* You read where it says major depression, single episode,--
>
> *A.* Yes.
>
> *Q.* -- severe, without psychosis?
>
> *A.* Yes.
>
> *Q.* But you don't agree that the Defendant did not have a psychosis, do you?
>
> *A.* No. My opinion is different as to the diagnosis.

The prosecutor later referred to Dr. Shahid's report in his examination of his own expert, Dr. Balay, again referring to Dr. Shahid's diagnosis, and asking if Balay agreed with Dr. Shahid's diagnosis. She answered yes. He also repeatedly mentioned Dr. Shahid and his diagnosis in closing arguments, telling the jury that "it's real important to look at what Dr. Shahid had to say, even though he did not testify here before you."[2] Defense counsel did not object to the questioning of the witnesses on the basis of Dr. Shahid's report and diagnosis or to the prosecutor's arguments.

---

[2] In addition, the prosecutor also referred to Dr. Shahid in the following excerpts from his closing arguments:

> Dr. Shahid is the one at Flower Hospital who talked to [defendant] the day after this happened . . . . And . . . Dr. Shahid wrote a report that became a very important part of what Dr. Balay later did as far as her report is concerned. . . .

6

The jury found defendant guilty but mentally ill of the charged offenses. He was sentenced to 45 months to 20 years in prison for the home invasion conviction, 1 to 4 years for each of the felonious-assault convictions, and 2 years for the felony-firearm conviction.

Defendant appealed in the Court of Appeals and moved for an evidentiary hearing regarding his claim of ineffective assistance of counsel.[3] The Court of Appeals granted defendant's motion. Following an evidentiary hearing, the trial court denied defendant's motion for a new trial. The Court of Appeals affirmed. *People v Fackelman*, unpublished opinion per curiam of the Court of Appeals, issued August 27, 2009 (Docket No. 284512). The court rejected defendant's challenges to the use of Dr. Shahid's report at his trial, concluding that the prosecutor had proceeded properly in his use of the report in all instances except in his direct examination of Dr. Balay and that defendant could not show outcome-determinative prejudice with respect to that error. We granted defendant's application for leave to appeal. *People v Fackelman*, 486 Mich 907 (2010).

---

\* \* \*

Dr. Shahid was told a lot of things about what happened . . . by [defendant]. . . . And Dr. Shahid reached the conclusion at the end [of] his examination that [defendant] was depressed, he had severe depression, but that there was no psychosis involved. . . .

\* \* \*

And I submit to you from what you've heard from Dr. Mistry, from what you've heard from Dr. Balay, and the references you've heard to Dr. Shahid's report . . . .

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

7

## II. STANDARD OF REVIEW

Whether the admission of Dr. Shahid's opinion regarding defendant's mental state violated defendant's Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo. *People v Jackson*, 483 Mich 271, 277; 769 NW2d 630 (2009).

## III. ANALYSIS

## A. RIGHT OF CONFRONTATION

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." US Const, Am VI. Since its birth as a state, Michigan has also afforded a criminal defendant the right to "be confronted with the witnesses against him," adopting this language of the federal Confrontation Clause verbatim in every one of our state constitutions. Const 1839, art 1, § 10; Const 1850, art 6, § 28; Const 1908, art 2, § 19; Const 1963, art 1, § 20. These constitutional provisions are underscored by MCL 763.1, which provides a criminal defendant the express right to "meet the witnesses who are produced against him face to face." These exact words have been codified in Michigan law since 1846. 1846 RS, ch 151, § 1; 1857 CL 5704; 1871 CL 7503; How Stat 9068; 1897 CL 11796; 1915 CL 15623; 1929 CL 17129.

"These constitutional and statutory provisions are not accidental. They were incorporated in the jurisprudence of this country by reason of the universal condemnation of the inquisitorial methods of the star chamber which had been in force in England." *People v Saccoia*, 268 Mich 132, 135; 255 NW 738 (1934). Specifically, the right to a face-to-face meeting with one's accusers described in MCL 763.1 is deeply rooted in the

8

common-law right of confrontation. It can be directly traced back to the paradigmatic violation of this right, *The Trial of Sir Walter Raleigh for High Treason, 1603*, 2 Cobbett's Complete Collection of State Trials 1 (T. B. Howell, ed, 1809), in which Sir Walter Raleigh was convicted of treason after being denied the opportunity to confront his alleged accomplice and accuser, Lord Cobham, who had implicated him in a letter that was read to the jury. On trial for his life, Raleigh urged, "If there be but a trial of five marks at Common Law, a witness must be deposed. Good my lords, let my Accuser come face to face, and be deposed." *Id.* at 19.

This was the notorious example of unfairness that the Framers had in mind and wished to avoid when they guaranteed every criminal defendant the right to be confronted with the witnesses against him. To John Adams, who later drafted the Massachusetts Confrontation Clause, the contours of this right were quite clear: "Every Examination of Witnesses ought to be in open Court, in Presence of the Parties, Face to Face." 30 Wright & Graham, Federal Practice & Procedure, Evidence, § 6345, pp 521-522 (quotation marks and citation omitted). The great virtue of confrontation and cross-examination, repeatedly emphasized in founding-era documents, is that these mechanisms advance the pursuit of truth in criminal trials better than any others. See 3 Blackstone, Commentaries on the Laws of England (Jones, ed, 1976), p 373:

> This open examination of witnesses *viva voce*, in the presence of all mankind, is much more conducive to the clearing up of truth, than [a] private and secret examination . . . [given that] a witness may frequently depose that in private which he will be ashamed to testify in a public and solemn tribunal. . . . Besides, the occasional questions of the judge, the jury, and the counsel, propounded to the witnesses on a sudden, will sift out the truth much better than a formal set of interrogatories previously penned and settled; and the confronting of adverse witnesses is also another

opportunity of obtaining a clear discovery, which can never be had upon any other method of trial.

See also Hale, The History of the Common Law of England (6th ed, 1820), p 345:

[O]ftentimes witnesses will deliver [in private] that, which they will be shamed to testify publicly. . . . [M]any times the very MANNER of delivering testimony, will give a probable indication, whether the witness speaks truly or falsely. . . . [Cross-examination] beats and boults out the truth much better . . . . [A]nd [is] the best method of searching and sifting out the truth . . . .

Our country's Sixth Amendment jurisprudence has never lost sight of the truth-seeking function of the right of confrontation. See, e.g. *Mattox v United States*, 156 US 237, 242-243; 15 S Ct 337; 39 L Ed 409 (1895);[4] *California v Green*, 399 US 149, 158; 90 S Ct 1930; 26 L Ed 2d 489 (1970);[5] *Crawford v Washington*, 541 US 36, 61; 124 S Ct

---

[4] In *Mattox*, 156 US at 242-243, the United States Supreme Court explained that

[t]he primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which gives his testimony whether he is worthy of belief.

[5] *Green*, 399 US at 158, listed several specific ways in which confrontation advances the truth:

(1) [It] insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility. [Citation omitted.]

1354; 158 L Ed 2d 177 (2004).[6] This historical understanding underscores that "the confrontation guarantee serves not only symbolic goals. The right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials." *Lee v Illinois*, 476 US 530, 540; 106 S Ct 2056; 90 L Ed 2d 514 (1986).

In pursuit of the Clause's truth-seeking purpose, our criminal jurisprudence is clear, then, that "[a] person accused of a crime has a right, at his trial, to be confronted, face to face, with the witnesses against him." *People v Nutter*, 255 Mich 207, 215; 237 NW 384 (1931). We also know that the Confrontation Clause applies only to statements used as substantive evidence. Cf. *Tennessee v Street*, 471 US 409, 413-414; 105 S Ct 2078; 85 L Ed 2d 425 (1985) (holding that evidence admitted solely for impeachment purposes did not violate the Confrontation Clause); see also *People v McPherson*, 263 Mich App 124, 133; 687 NW2d 370 (2004). And we understand from the constitution that the right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of "witnesses," those people who bear testimony against a defendant. *Crawford*, 541 US at 51.

In light of these venerable legal principles, it is clear that defendant was denied his constitutional right of confrontation. Dr. Shahid did not appear at defendant's trial, and defendant was not afforded "the privilege to confront [him] and cross-examine [him] face

---

[6] *Crawford*, 541 US at 61, emphasized that

> [t]o be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

11

to face . . . ." *Snyder v Massachusetts*, 291 US 97, 106; 54 S Ct 330; 78 L Ed 674 (1934), overruled on other grounds by *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964). Defendant was not given a prior opportunity to cross-examine Dr. Shahid, nor was it shown that the doctor was unavailable to testify at trial so that his absence could be excused for purposes of the right of confrontation. See 1 Cooley, Constitutional Limitations (8th ed), p 664, articulating one of the few exceptions to the confrontation rule: "If the witness was sworn . . . , and the accused had an opportunity then to cross-examine him, . . . it seems allowable to make use of his [testimony] . . . if the witness has since deceased, or has left the State, or is insane, or sick and unable to testify . . . ."[7]

Moreover, our review of the record leads inescapably to the conclusion that Dr. Shahid was a true "witness against" defendant. The ultimate issue at trial was not whether defendant had actually engaged in the conduct that led to the criminal charges; instead, it was whether he was legally insane at the time.[8] At trial, the medical term that

---

[7] The fact that defendant had the power to subpoena Dr. Shahid and call him as a witness is immaterial to this analysis. This Court long ago rejected this argument. *People v Perrin*, 223 Mich 132, 135-136; 193 NW 888 (1923). The United States Supreme Court has likewise consistently rejected this argument. See, e.g., *Melendez-Diaz v Massachusetts*, 557 US ___, ___; 129 S Ct 2527, 2540; 174 L Ed 2d 314 (2009) ("[T]he Confrontation Clause imposes a burden on the *prosecution* to present its witnesses, not on the defendant to bring those adverse witnesses into court.") (emphasis added); *Briscoe v Virginia*, 559 US ___; 130 S Ct 1316; 175 L Ed 2d 966 (2010) (vacating the judgment of the Virginia Supreme Court, which held that a defendant's failure to timely notify the commonwealth of his desire to confront a forensic analyst at trial constituted a waiver of that right); *Bullcoming v New Mexico*, 564 US ___, ___; 131 S Ct 2705, 2718; 180 L Ed 2d 610 (2011) ("The prosecution . . . bears the burden of proof. Hence, the obligation to propel retesting when the original analyst is unavailable is the State's, not the defendant's.") (citation omitted).

[8] "An individual is legally insane if, as a result of mental illness . . . , that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his

12

both testifying experts used as shorthand for describing legal insanity was "psychosis," which, as the prosecutor's expert explained to the jury, is "when a person loses touch with reality." Repeatedly, the jury's attention was focused on this particular mental state. The experts defined "psychosis," described the symptoms of a person in a "psychotic state," debated whether a person "could slip in and out of [psychosis] at various time frames," offered their opinions regarding the effect of psychosis on memory, and rendered their own diagnoses in terms of whether defendant was experiencing psychosis, with the defense expert, Dr. Mistry, concluding that he was and the prosecution's expert, Dr. Balay, concluding that he was not. In this context, the prosecutor's improper introduction and repeated use of Dr. Shahid's diagnosis that defendant was not, in fact, experiencing psychosis fully rendered the doctor a witness against defendant. "In short, when the State elected to introduce [the statement of a nontestifying scientific expert], [that expert] became a witness [the defendant] had the right to confront." *Bullcoming v New Mexico*, 564 US __, __; 131 S Ct 2705, 2716; 180 L Ed 2d 610 (2011).

Our review of the record also makes clear that Dr. Shahid's diagnosis of "[m]ajor depression, single episode, severe without psychosis" was used as substantive evidence for "the truth of the matter asserted." MRE 801(c).[9] Its admission for this purpose was barred by the Confrontation Clause. Cf. *Street*, 471 US at 413-414. The prosecutor went

_____

or her conduct or to conform his or her conduct to the requirements of the law." MCL 768.21a(1).

[9] As "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Dr. Shahid's report, including his diagnosis, clearly constituted hearsay. MRE 801(c).

13

well beyond the scope of the direct examination and placed Dr. Shahid's diagnosis before the jury in his cross-examination of Dr. Mistry, who, very significantly, had not referred to Shahid's critical diagnosis in his direct testimony. Then, the prosecutor explicitly used Dr. Shahid's diagnosis in his examination of both experts and in closing arguments. On each occasion, the obvious use of the diagnosis was as substantive evidence for its truth-- that defendant was not experiencing psychosis as a result of the circumstances of his son's death and his perception of Krell's conduct. The prosecutor did not use Dr. Shahid's opinion to impeach his own witness, Dr. Balay, who agreed with Dr. Shahid's diagnosis. Nor does it make sense to suggest that Dr. Shahid's opinion impeached Dr. Mistry's credibility, except insofar as it provided an independent piece of substantive evidence weighing in favor of the competing view of Dr. Balay.[10] Dr. Shahid's diagnosis of no psychosis could only impeach or support the other experts' opinions if it was taken as true, something the prosecutor made clear in his closing

---

[10] Any other view would make the protections of the Confrontation Clause illusory. Indeed, the prosecutor would not even have to produce his own expert if he could place before the jury absent medical experts' testimonial diagnoses through the examination of testifying experts. "The Court [has] made clear . . . that it will not permit the testimonial statement of one witness to enter into evidence through the in-court testimony of a second[.]" *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2546 (Kennedy, J., dissenting). Moreover, we would not require juries to engage in the mental gymnastics necessary to conclude that Dr. Shahid's opinion was not meant to be taken as "true," but only to "impeach" a contrary opinion. How can an opinion, if not actually true, effectively impeach a contrary opinion? Just as Dr. Mistry's diagnosis was being used as substantive evidence that defendant was insane, Dr. Shahid's diagnosis was being used as substantive evidence that he was not. As Dr. Mistry himself noted, the only difference between their opinions was that they were "different as to the diagnosis."

14

arguments when he told the jury that "it's real important to look at what Dr. Shahid had to say, even though he did not testify here before you" and then proceeded to rely on Dr. Shahid's opinion as a third expert's vote on defendant's sanity:

> And then I went to the conclusion part and said: Well, Dr. Mistry, why is it then that Dr. Shahid says here that there's no psychosis and you say there was a psychosis. And the most he could say was: Well, different people have different opinions. Well, that's true, different people can have different opinions.
>
> . . . And I submit to you from what you've heard from Dr. Mistry, from what you've heard from Dr. Balay, and the references you've heard to Dr. Shahid's report, there aren't any real reasons behind Dr. Mistry's conclusion that the Defendant was suffering from a psychosis, not any real reason at all.

Finally, we conclude that Dr. Shahid's diagnosis unquestionably falls within the "core class of 'testimonial' statements" that are subject to the Confrontation Clause. *Crawford*, 541 US at 51. The report memorialized defendant's medical history and the events that led to his admittance to the hospital, provided the all-important diagnosis, and outlined a plan for treatment.[11] It was Dr. Shahid's "testimony" regarding defendant's mental illness, his "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.*, quoting 2 Webster, An American Dictionary of the English Language (1828).

And Dr. Shahid's report was "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]'" *Id.* at 52 (citation omitted); see also *Melendez-Diaz v Massachusetts*, 557

---

[11] The report is on hospital letterhead, is headed "Psychiatric Evaluation," and is signed and dated by Dr. Shahid.

15

US ___, ___; 129 S Ct 2527, 2531-2532; 174 L Ed 2d 314 (2009) (quoting *Crawford* and employing this test to ascertain that the statement at issue was testimonial). Specifically, the following indications, taken together, are highly probative in this respect: (1) defendant's admittance to the hospital was arranged by lawyers, (2) defendant was arrested en route to the hospital, (3) the report noted that the Monroe County Sheriff requested notification before defendant's discharge, (4) defendant referred to a trial and to a gun in his responses related in the report, and, perhaps most significantly, (5) at its very beginning and ending, in which its overall context is most clearly identified, the report expressly focused on defendant's alleged crime and the charges pending against him. In the introductory paragraph, Dr. Shahid stated:

> 47-year-old Caucasian married male was referred by Rescue Crisis Mental Health Services with an emergency application indicating that the patient's son was killed eight months ago in a traffic accident, and the patient drove to the man's home with a gun who patient felt was responsible for the death of his son. Patient has severe depression and had suicidal thoughts to overdose. The emergency application also indicated that the Monroe County sheriff wants to be called when the patient is discharged to home.

Then in the very last paragraph, Dr. Shahid again referred to the criminal charges pending against defendant, listing these charges in precise legal language: "Patient also has legal charges against him through the State of Michigan 38[th] Judicial Circuit, and count one is home invasion, first degree, and count two is assault with a dangerous weapon (felonious assault)." Under these circumstances, an "'objective [psychiatrist] would reasonably [be led] to believe that [his statements] would be available for use at a later trial.'" *Crawford*, 541 US at 51 (citation omitted); *Melendez-Diaz*, 557 US at ___; 129 S Ct at

16

2531.[12]  Accordingly, in our judgment, the admission in evidence of Dr. Shahid's diagnosis, an out-of-court, testimonial statement offered for its truth, violated defendant's constitutional right to be confronted with the witnesses against him.

## B.  EVIDENTIARY ERRORS

There are other reasons why the use of Dr. Shahid's report at defendant's trial was improper.  First, MRE 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference *shall be in evidence*."  (Emphasis added.) This rule permits "an expert's opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert's hearsay testimony."  468 Mich xcv, xcvi (staff comment to the 2003 amendment of MRE 703).

It is undisputed that both Dr. Mistry and Dr. Balay reviewed Dr. Shahid's report in making their determinations regarding defendant's mental state.  Indeed, Dr. Balay specifically testified that Dr. Shahid's report constituted a "big part" of her opinion.  It is understandable why the testifying doctors would rely heavily on Dr. Shahid's report, given that he was the only doctor to evaluate defendant shortly after the offense.  Thus, the facts and data documented in his report provided distinctive insight into defendant's state of mind at the time of the offense.  Because the facts and data in Dr. Shahid's report

---

[12] We do not overlook other post-*Crawford* cases in which the United States Supreme Court has further developed the meaning of "testimonial statements" within its Confrontation Clause jurisprudence.  Rather, we find that these cases are inapposite.  See *Davis v Washington*, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006) (concerning statements made in an ongoing domestic-violence emergency); *Michigan v Bryant*, 562 US ___; 131 S Ct 1143; 179 L Ed 2d 93 (2011) (concerning statements made in an ongoing non-domestic-violence emergency).

were essential to the testifying experts' opinions, they were required to have been admitted into evidence under MRE 703.

However, Dr. Shahid's report contained more than just "facts" and "data"; it also contained the doctor's all-important diagnosis. Under MRE 703, only the facts and data contained in the report were admissible. As previously discussed, Dr. Shahid's actual *diagnosis*, a testimonial statement offered for its truth, was barred by the Confrontation Clause. In addition to this constitutional barrier, the diagnosis itself was inadmissible under MRE 703 because it constituted an "opinion," and thus did not fall within the ambit of MRE 703, which renders admissible only the "*facts* or *data* . . . upon which an expert bases an opinion or inference . . . ." (Emphasis added.)[13] Thus, because the diagnosis was inadmissible, under the United States Constitution, the Michigan Constitution, and MRE 703, the report should have been redacted before it was admitted into evidence, and the jury should have been instructed that the proper and limited purpose of the report was to allow them to consider the facts and data on which the testifying experts based their opinions.[14]

---

[13] Dr. Shahid, who did not appear at trial and thus was never qualified as an expert, could not, of course, have provided "opinion" testimony. See MRE 702 (requiring that a witness must be qualified as an expert before he or she may "testify . . . in the form of an opinion"). Although the jury heard much praise of Dr. Shahid-- including that he is the "senior psychiatrist . . . on staff at Flower [Hospital]," has an "M.D.," and "is a fantastic doctor"-- he was never subjected to voir dire and was not qualified as an expert under MRE 702.

[14] The jury was given the following instruction:

> Experts are allowed to give their opinions in court about matters which they are experts on. However, you do not have to believe an expert's opinion. Instead, you should decide whether you believe it and how

18

Second, contrary to the prosecutor's contention, Dr. Shahid's report, including his diagnosis, was not admissible at defendant's trial under the business records exception to the hearsay rule, MRE 803(6). As a "report . . . [of] opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge," Dr. Shahid's report may well have fallen within the scope of the business records exception, but the rule requires that its elements "all [be] shown by the testimony of the *custodian or other qualified witness . . . .*" *Id*. (emphasis added).[15] Thus, a recordkeeper

important you think it is. When you decide whether you believe an expert's opinion, think carefully about the reasons and facts that he or she gave for his or her opinion and whether those facts are true.

Although this instruction was proper, because the jury never actually received Dr. Shahid's report as required by MRE 703, the jury was unable to fulfill the court's charge.

[15] Under the dissent's application of the business records exception, the requirement that the record must be authenticated would essentially be stricken from the rule. The dissent concludes that "defendant cannot receive relief on the basis of authentication error." *Post* at 36. We disagree. There can be no doubt that had the prosecutor moved to admit Dr. Shahid's report under the business records exception, and had defendant objected because no "custodian or other qualified witness" was present to testify to the elements of MRE 803(6), the report could not have been admitted. See *Moncrief v Detroit*, 398 Mich 181, 189; 247 NW2d 783 (1976) (explaining the "first principle" that "the proponent of the [hearsay] evidence must lay a foundation which establishes an exception to the hearsay rule").

Even more importantly, we do not accept the dissent's conclusion that the lack of authentication was harmless. Had the prosecutor sought to admit the report as a business record (which he did not), and had the court required the prosecutor to comply with MRE 803(6) (which under the rule, it must), then a "custodian or *other qualified witness*" from Flower Hospital would have been present at defendant's trial. Far and away, the witness from Flower Hospital *most* qualified to authenticate the report would have been Dr. Shahid himself, and, at least in our judgment, defendant suffered serious prejudice because of his absence at trial. See part III(C) of this opinion. However, even if the authenticating witness was merely a hospital recordkeeper, the dissent fails to appreciate

19

or other qualified witness from Flower Hospital would have had to testify for the report to have been properly admitted. This was not done.

Finally, we note that even if the prosecutor had sought to admit the entire report pursuant to the procedures required by MRE 803(6), any testimonial statements contained in the report offered for their truth would have been inadmissible under the business records exception. See *Crawford*, 541 US at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence . . . ."). Because, as we have already determined, Dr. Shahid's diagnosis constituted a testimonial statement offered for its truth, it could not have been admitted under the business records exception to the hearsay rule.

## C. PLAIN ERROR

Because defense counsel did not object to the use of Dr. Shahid's report, we review these constitutional and evidentiary errors for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).[16] We conclude that defendant is entitled to relief under this standard. The violations of

---

that this witness still might well have provided meaningful information to the jury. For instance, this witness could have answered some basic questions that were never properly answered at defendant's trial, such as: Who is Dr. Shahid? Is his report the kind of record that is kept in the regular course of business at Flower Hospital? Do doctors in making such reports often refer to a patient's pending criminal charges? And do doctors typically review other materials, such as police reports, when they create their reports?

[16] We believe that defendant is entitled to relief under either the plain error standard articulated in *Carines*, or the ineffective assistance of counsel standard set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). We proceed under the former only because it requires the *higher* showing, which, in our judgment, defendant has made.

defendant's right of confrontation and the evidentiary errors were clear and obvious. In addition, defendant can show that the errors resulted in outcome-determinative prejudice. *Id.* at 763. As discussed previously, the ultimate issue at trial was whether defendant was legally insane at the time of the incident, or, in the parlance used at trial, whether he was experiencing psychosis. In assessing the effect of Dr. Shahid's diagnosis on the jury's determination regarding this issue, three facts strike us as significant. First, Dr. Shahid's diagnosis of no psychosis provided a tiebreaking expert opinion in a trial that is fairly characterized as a battle of two experts. Second, Dr. Shahid was the only expert unaffiliated with either party. Third and most importantly, he was the only doctor to have examined defendant within days of the incident, at a time when defendant may still have been experiencing a psychotic episode. The other experts did not interview defendant until months later, when defendant had been on antipsychotic medication for some time. Thus, both the defense and prosecutor's experts were necessarily trying to re-create defendant's mental state at the time of the crime. Dr. Shahid was the only doctor who had personal knowledge concerning this dispositive issue.

In sum, a reasonable juror evaluating the difficult issue of defendant's mental state at the time of the offense could not have overlooked the significance of Dr. Shahid's diagnosis, which constituted the tiebreaking, neutral expert opinion of the only doctor who had personal knowledge regarding whether defendant was experiencing symptoms of psychosis near the time of the offense. That defendant was not accorded the opportunity to meet this all-important witness "face to face" and to subject him to cross-examination clearly resulted in prejudice. Even a surface review of this record leaves one with many questions for Dr. Shahid's empty witness chair. For instance, what precisely

were the reasons for his diagnosis? How did he reconcile his diagnosis with certain objective indicators of the severity of defendant's mental illness documented in the report, such as the fact that Dr. Shahid assigned defendant a Global Assessment of Functioning score of 20 out of 100, which Dr. Mistry opined indicated a "significant level of impairment or likelihood to harm oneself or . . . others"; that defendant was prescribed an antipsychotic medication; that defendant had attempted suicide; that defendant had been admitted to the psychiatric intensive care unit for his safety; and that, although defendant was "denying auditory or visual hallucinations" at the time of the examination, defendant stated that, after his son's death, "'I was smelling things and I felt things crawling under my skin'"? Moreover, did defendant actually make the statements attributable to him in Dr. Shahid's report, or did Dr. Shahid obtain the statements from another source, such as a police report?[17] As Dr. Mistry stated when the prosecutor asked him this exact question, "That would be a question for Dr. Shahid." Indeed, *all* these questions are questions for Dr. Shahid, and they went unanswered because he did not testify at defendant's trial.

The evidentiary errors that occurred at defendant's trial compounded the prejudice caused by the violation of his right of confrontation. In contravention of the mandate in MRE 703 that the report be "in evidence," and in spite of the fact that a juror, whose curiosity was understandably piqued by the frequent references to Dr. Shahid's report, expressly requested to see the "reports that the attorneys were speaking of and the doctors

---

[17] The possibility that Dr. Shahid was relying on a police report when he prepared his report is supported by the report's final sentence, which lists the charges pending against defendant in precise legal detail as a police report would.

22

were speaking [of] too," the jury was never allowed to examine the report for itself. This error was especially prejudicial to defendant because the prosecutor had imprecisely characterized the contents of Dr. Shahid's report. Specifically, in closing, the prosecutor discussed the statements attributable to defendant in the report and told the jury that defendant "seemed to remember a lot of things" about his altercation with Krell.[18] In actuality, however, the report consistently documented defendant's inability to remember all but a few details of the incident.[19] Because the report was not "in evidence" as required by MRE 703, the jury was unable to assess the accuracy of the prosecutor's statements against the facts and data contained in the report and was more likely to have accepted the prosecutor's characterizations.

Moreover, because the prosecutor never attempted to satisfy the foundational requirements of the business records exception and to authenticate the report, the jury was not given the most basic information it needed to properly consider this document.

---

[18] More fully, the prosecutor said:

> On March 29th of 2007, Dr. Shahid was told a lot of things about what happened on March 28th, the day before, by Mr. Fackelman. He seemed to remember a lot of things. He remembered going to the place where Randy Krell lived. He remembered seeing Randy Krell and threatening him with a gun. He remembered going in the house, breaking the door down. He remembered seeing the person that [he] encountered once he was in that house. In other words, he remembered just about everything when he talked to Dr. Shahid the next day.

[19] What Dr. Shahid's report, in fact, says is: "Patient states, 'I do not remember driving to Michigan and driving to his house. I do not remember what happened, and the only thing I remember is that I saw a terrified look on that man's face and at that time I felt I just woke up and started apologizing to [Williams].'"

23

That is, it was never established that the report was what the prosecutor asserted it to be--a report (1) that contained "information transmitted by . . . a person with knowledge [Dr. Shahid]," (2) that was "kept in the course of a regularly conducted business activity," and (3) that it was "the regular practice of [Flower Hospital] to make . . . ." MRE 803(6).

In summary, Dr. Shahid did not appear at trial, he was not subject to cross-examination, and his report was neither in evidence nor authenticated. We have little difficulty concluding that the principal error here-- the violation of defendant's right of confrontation-- was outcome-determinative. *Carines*, 460 Mich at 763. As discussed, Dr. Shahid was the only doctor to examine defendant within days of the incident and thus, the only expert with personal knowledge of defendant's mental state immediately after the offense. In this way, the trials of defendant and Sir Walter Raleigh, though separated by centuries and factually unrecognizable, were fundamentally deficient in the same way: at the public trial at which their guilt or innocence was determined, neither man was confronted "face to face" with the most important witness against him. This constitutional error was compounded by the multiple evidentiary errors that resulted from the haphazard manner in which Dr. Shahid's report was handled at trial. The effect of these errors gave the prosecutor the best of all possible worlds and defendant the worst of these. The prosecutor was able to employ Dr. Shahid's diagnosis as substantive evidence that defendant was not experiencing psychosis at the time of the incident, without Dr. Shahid having to explain his diagnosis on cross-examination; err in his description of the contents of Dr. Shahid's report without the report being in evidence; and rely on a

24

hearsay report without having to prove its authenticity and accuracy in the manner prescribed by MRE 803(6).

Once a defendant demonstrates outcome-determinative plain error, an appellate court must exercise its discretion in deciding whether to reverse. *Carines*, 460 Mich at 763. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (quotation marks and citations omitted). Both of these considerations move us in our discretion to vacate defendant's convictions. Defendant's guilt or innocence under the law depends on whether he was legally sane at the time of the offense and thus may be held criminally responsible. It was not only the understandable grief caused by the loss of a child that defined defendant's mental state at the time of the offense, but also his feelings of being abused both by the man he believed was responsible for his son's death and by the legal system that treated this man's actions as a mere misdemeanor. Considering this background, it is imperative that defendant have the opportunity to be confronted with the most powerful witness against him before his guilt or innocence is decided. In this process, defendant was denied an ancient right in our criminal system, one on which our adversarial system is premised. If not redressed, this error would, in our judgment, seriously affect the fairness, integrity, or public reputation of the proceedings.

## IV.  RESPONSE TO DISSENT

It is necessary to respond more fully to the disagreements between this opinion and the dissent, specifically with regard to the dissent's sua sponte argument that

defendant somehow waived his right to confront Dr. Shahid, and with respect to our differing perspectives on the Confrontation Clause.

## A. WAIVER

The dissent would hold that "defendant affirmatively waived his right to confront Dr. Shahid because he chose, as a matter of trial strategy, not to call him as a witness." *Post* at 11. As the prosecutor understood, but the dissent does not, this argument is indefensible.[20] Waiver has been defined as "the 'intentional relinquishment or abandonment of a known right.'" *Carines*, 460 Mich at 762 n 7, quoting *United States v Olano*, 507 US 725, 733; 113 S Ct 1770; 123 L Ed 2d 508 (1993). The dissent does not claim that defendant affirmatively waived his constitutional right when his counsel expressed satisfaction with a court ruling allowing the prosecutor's use of Dr. Shahid's diagnosis, because no such ruling was made. Cf. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Nor does the dissent claim that defendant affirmatively waived his constitutional right because his counsel was aware of the confrontation violation at trial but knowingly stood silent, because it is clear this is not what occurred. Specifically, at the *Ginther* hearing, counsel expressly testified that he did not object to the prosecutor's use of Dr. Shahid's report only because he did not recognize it as a confrontation violation; thus, he could not, and did not, *intentionally* relinquish a *known* right. Nor does the dissent claim that defendant affirmatively waived his constitutional

---

[20] The prosecutor himself never argued that defendant waived his confrontation right, with no mention of waiver either in his brief or at oral argument. Rather, he properly considered the issue forfeited and fully addressed the merits of the confrontation issue.

26

right by himself placing Dr. Shahid's diagnosis in evidence because this also did not take place.

Instead, as noted earlier, the dissent claims that defendant waived his constitutional right to confrontation because "he chose, as a matter of trial strategy, not to call him as a witness." *Post* at 11. Not only is the dissent's waiver argument incompatible with the traditional understanding of waiver, but it also violates several first-principles of criminal law: (1) insanity is an affirmative defense with respect to which a defendant carries the burden of proof, (2) rules of evidence cannot trump the constitution, and (3) the prosecutor bears the ultimate burden of proof in criminal cases. The dissent misapprehends and misapplies each of these first-principles.

First, "it is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense," MCL 768.21a(1), and the defendant "has the burden of proving the defense of insanity by a preponderance of the evidence." MCL 768.21a(3). In accord with this framework, defendant's expert, Dr. Mistry, testified first on the issue of defendant's mental state at the time of the offense. In his testimony, Dr. Mistry referenced Dr. Shahid's report, as well as other reports, but he never mentioned Dr. Shahid's diagnosis. Thus, the dissent's insight, on which it bases its waiver argument-- that "it was *defendant* who first raised the issue of his insanity and who first opened the door to questioning about Dr. Shahid's evaluation"-- is considerably less remarkable than the dissent believes it to be, because there is simply no other way in which a defendant in these circumstances could conceivably have raised an insanity defense other than through the testimony of a credible expert witness. *Post* at 10. No such witness could have neglected altogether to

27

mention the existence of the report of the only person who actually interviewed defendant in the immediate wake of his conduct.

Second, the rules of evidence do not trump the Confrontation Clause. See *Crawford*, 541 US at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence . . . ."). Thus, although parts of Dr. Shahid's report should have been in evidence under MRE 703 because they constituted "the facts or data . . . upon which an expert bases an opinion,"[21] and although under MRE 106's 'rule of completeness' the whole document may sometimes be admitted,[22] these rules necessarily give way to the requirements of the Confrontation Clause. Though parts of the report may have been admissible under the rules of evidence, the rules of evidence cannot override the Sixth

---

[21] See *supra* at 17-18. The dissent concludes that MRE 703 required *defendant* to admit Dr. Shahid's report into evidence. However, the rule is silent as to which party must ensure that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." Both parties' experts relied on the report.

[22] MRE 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Thus, in making what is clearly a discretionary decision, the trial court would have had to assess the "fairness" of admitting the entire report in this case in light, *inter alia*, of the fact that defendant's expert had not testified in any way as to the substance of the report and in view of the fact that there might be constitutional implications to requiring defendant to introduce an expert's report adverse to his affirmative defense. The dissent misinterprets MRE 106 by asserting that this discretionary rule "would have required" that the entire psychiatric evaluation be introduced into evidence in these circumstances. *Post* at 33 n 80.

Amendment and cannot be used to admit evidence that would otherwise implicate the Sixth Amendment.[23]

The dissent's indignation over Dr. Mistry's "selective" use of the report illustrates its confusion on this point. *Post* at 10. Without a doubt, Dr. Mistry used the report "selectively." That is precisely our point. On direct, he testified that he relied on the report, which contained facts and data that formed the basis of his opinion, but he never mentioned Dr. Shahid's actual diagnosis, an *opinion* that is neither a "fact" nor "data," and which did not form the basis of Dr. Mistry's contrary opinion.[24] Such direct testimony regarding the report was entirely proper. Because this testimony defined the permissible scope of cross-examination and, more fundamentally, because the report contained the testimonial statement of a witness defendant had the right to confront, the prosecutor had to either: (1) proceed narrowly, employing the facts and data in the report on which the experts relied in forming their own opinions, but *not* Dr. Shahid's opinion; or (2) call Dr. Shahid to testify as to his opinions.[25] Yet, the prosecutor did neither and

---

[23] To be clear, we believe that Dr. Shahid's diagnosis was inadmissible under MRE 703 and MRE 106, irrespective of the Confrontation Clause. See *supra* at 17-18 and n 22.

[24] The dissent fails to recognize that Dr. Shahid's report is comprised of many statements, only one of which concerns Dr. Shahid's diagnosis, and that it was the prosecutor's introduction of *this* statement which violated defendant's right of confrontation. The dissent's determination not to differentiate among statements within the report and consider each on its own merits strains its analysis from the start. The out-of-court statement on which the proper confrontation analysis is focused is Dr. Shahid's *diagnosis*, and defendant never used *that* statement, selectively or otherwise.

[25] The dissent misunderstands this opinion in suggesting that "the majority believes that no impeachment of the defense expert could have occurred under these circumstances unless the prosecutor called Dr. Shahid as it own witness," and in asserting that we "hamstring the impeachment of an expert witness . . . ." *Post* at 40. To the contrary,

29

instead placed Dr. Shahid's diagnosis before the jury during his cross-examination of Dr. Mistry; employed this same diagnosis in the examination of his own expert; and repeatedly referred to this same diagnosis in closing arguments, all without calling Dr. Shahid as a witness.[26]

Third, the ultimate burden of proof rests with the prosecutor, and thus the obligation to bring to trial "witnesses against" the accused is the state's, not the defendant's.[27] The dissent would turn on its head this principle by holding that

what this opinion concludes is that the statement at issue-- Dr. Shahid's diagnosis-- was clearly *not* being used for impeachment. We also note that the prosecutor had many avenues of proper impeachment, including the utilization of the facts and data contained in Dr. Shahid's report relied on by the defense expert.

[26] We reiterate our view that the prosecutor's use of Dr. Shahid's diagnosis on each of these occasions was clearly for the truth of the matter asserted. See *supra* at 13-15. The dissent disagrees, and goes to lengths to explain how the report was used for impeachment purposes. See *post* at 27-32. The problems with the dissent's analysis are threefold. First, it is not focused on the *diagnosis* as implicating the Confrontation Clause, but rather lumps together the entirety of the report. Second, the dissent never even attempts to explain how a diagnosis such as Dr. Shahid's could impeach another expert's opinion if it is not taken as true. Finally, the dissent again never even attempts to explain how the prosecutor could have used this diagnosis to impeach his own expert, who *agreed* with it. Like the Court of Appeals, we think it is evident that during the prosecutor's direct examination of Dr. Balay, he used the remarks from Dr. Shahid's report as substantive evidence "to prove the truth of the matter asserted . . . ." *Fackelman*, unpub op at 6. We do, however, agree with the dissent's impeachment discussion in one respect: we too conclude that the prosecutor's repeated reference to Dr. Shahid's report and diagnosis during his closing argument, including his statement urging that "it's real important to look at what Dr. Shahid had to say, even though he didn't testify here before you," was for the truth of the matter asserted. Unlike the dissent, though, we find these arguments prejudicial and entirely indicative of how the prosecutor employed the report and diagnosis throughout trial.

[27] Because defendant bore the burden on the affirmative defense of insanity, he had to initiate the presentation of evidence that he was legally insane at the time of the offense.

"defendant affirmatively waived his right to confront Dr. Shahid because *he* chose, as a matter of trial strategy, not to call him as a witness."[28] *Post* at 11 (emphasis added).

The dissent can only arrive at its conclusion that defendant waived his right to confront Dr. Shahid by transforming first-principles of criminal law and creating a constitutional environment in which: (1) a criminal defendant must choose between raising an affirmative defense and his right of confrontation, (2) the rule of completeness is on par with the Sixth Amendment, and (3) the burden of proof may sometimes shift from the state to the accused to call witnesses against himself.

## B. *MELENDEZ-DIAZ*

Next, we must address the differing perspectives on the Confrontation Clause that exist between this opinion and that of the dissent. These differences are perhaps best understood by comparing the quotation that the dissent appears to believe lends the most

He was *not* required, however, to bring to trial "witnesses against" himself, a burden which rested with the prosecutor.

[28] As for the dissent's discussion of trial strategy, it suffices to say that it asks an irrelevant question of the wrong party. In this discussion, the dissent explores the reasons why *defense counsel* may have chosen not to call Dr. Shahid, and contends that this decision is entitled to deference under *Strickland*. We do not disagree with this; we just believe that the reasons for counsel's decision are irrelevant because defendant can be under no obligation to call "witnesses against" himself. The question-- "why didn't you call Dr. Shahid as a witness?"-- would be better directed toward the prosecutor, who *is* under such obligation. But even though one may be curious about the prosecutor's answer to this question-- especially because Dr. Shahid worked at a hospital only 30 minutes away-- his answer is also irrelevant. The only thing relevant is that the prosecutor *did not* call Dr. Shahid to testify at trial and made no showing regarding his unavailability, as he was required to do under the Confrontation Clause. In sum, counsel's strategic decision concerning which witnesses to call had no bearing on the clause. Rather, what implicated the clause was the prosecutor's substantive use of Dr. Shahid's diagnosis without calling him to testify.

31

support for its analysis-- footnote 2 of *Melendez-Diaz*-- with the quotation that we believe lends the most support for ours-- the Confrontation Clause itself, which states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  We respectfully believe that our analysis is on far surer constitutional footing than that of the dissent.

First, it is necessary to provide some context to the quotation highlighted by the dissent-- "[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today"-- which is the dissent's summarization of footnote 2 of *Melendez-Diaz.*  The question presented in that case was whether affidavits reporting the results of laboratory analyses, admitted at trial to show that a substance seized by police was cocaine, violated the defendant's right of confrontation.  Justice Kennedy in dissent responded that the "Court [was] sweep[ing] away an accepted rule governing the admission of scientific evidence," and offered cases in support of this claim in two appendices.  *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2543, 2558-2560.  Footnote 2 of the majority opinion sought to distinguish the cases cited by Justice Kennedy:

> Other[] [cases] are simply irrelevant, since they involved medical reports created for treatment purposes, which would not be testimonial under our decision today. See, *e.g.*, *Baber* v. *State*, 775 So. 2d 258, 258-259 (Fla. 2000); *State* v. *Garlick*, 313 Md. 209, 223-225, 545 A. 2d 27, 34-35 (1998). [*Id.* at ___ n 2; 129 S Ct at 2533 n 2.]

In comparing the actual footnote with the dissent's quotation, one discovers two highly relevant omissions.  When these omissions are considered, and when this quotation is placed in context, it hardly serves as authority to sustain the dissent's sweeping proposition.

First, the dissent fails to account for the final phrase of the sentence it finds so all-important-- "under our decision today." *Id*. Contrary to the suggestion of the dissent, the Supreme Court did not expressly state that a medical report created for treatment purposes is not a testimonial statement within the meaning of the Sixth Amendment's Confrontation Clause. What *Melendez-Diaz* actually stated was far narrower and more limited-- that the cases collected by Justice Kennedy were "irrelevant" because they involved "medical reports created for treatment purposes," whereas *Melendez-Diaz* involved an affidavit made for the purpose of providing testimony at trial. *Id.* Thus, *Melendez-Diaz* accurately stated that the medical reports cited by the dissent "would not be testimonial under our decision today" because *that* decision did not involve a medical report created for treatment purposes. *Id*. Determining the circumstances under which a medical report created for treatment purposes could be considered testimonial was simply left for another day.[29] That *Melendez-Diaz* did not hold what the dissent contends it held is supported by the fact that *Melendez-Diaz* did not in any way involve a medical report created for treatment purposes. Accordingly, the footnote is not only dictum, but it is dictum that in no way supports the dissent's assertion that "*none* of the nine justices who served on the *Melendez-Diaz* Court would have included medical reports created for treatment purposes in the definition of testimonial statements." *Post* at 2. This assertion

---

[29] We emphasize that we do not disagree that Dr. Shahid's report is a medical report created for treatment purposes. However, it is also a particular kind of medical report-- one involving a *psychiatric* opinion, and one prepared for a *legal* as well as a treatment purpose-- both factors being relevant in assessing the implications of the report under the Confrontation Clause.

has no basis because the Supreme Court was never presented with this question in *Melendez-Diaz*, and it has not been presented with this question in any subsequent case.

Second, the dissent omits any reference to the two citations that directly follow its quotation, *Baber v State* and *State v Garlick*. Read in the context of these two cases, the footnote communicates a critical distinction that courts have made concerning medical records. This distinction is evidenced by even a cursory review of these two cases. Both *Baber* and *Garlick* involved hospital records of laboratory results administered for medical treatment purposes, a blood alcohol test and a drug test, respectively. In each case, although the laboratory technicians did not testify at trial, other witnesses from the hospital did. In *Baber*, the hospital's medical records custodian laid a foundation under the business records exception to the hearsay rule, and the head of the hospital's chemistry department testified. *Baber*, 775 So 2d at 259. In *Garlick*, the emergency room physician who treated the defendant and ordered the drug screening testified. *Garlick*, 313 Md at 212.[30] In these circumstances, *Baber* and *Garlick* determined that the defendants' right of confrontation had not been violated, and by their citations of these cases, both opinions in *Melendez-Diaz* suggested their agreement with that conclusion.

However, neither *Baber* nor *Garlick* applied the "two-part test," see part IV(C) of this opinion, that the dissent believes *Melendez-Diaz* adopted to arrive at a per se rule that the admission of a medical report created for treatment purposes can never violate the

---

[30] These facts alone make the instant case distinguishable because (1) *no one* from the hospital testified at defendant's trial and (2) the missing witness was not a laboratory technician who had worked in conjunction with a primary treating doctor, but the primary doctor himself.

34

Confrontation Clause. Indeed, after recognizing the traditional understanding of "the concept of confrontation as a device to advance the search for truth," *Garlick* expressly qualified its holding in a passage that is particularly relevant to the instant case:

> This is not to say, however, that there have not been some hospital records (or more precisely some entries within those records) that have been objectionable or found to have been inadmissible. For example, in *Gregory* v. *State*, 40 Md. App. 297, 325, 391 A.2d 437, 454 (1978), the medical staff conference summary containing the opinions of several psychiatrists was not admissible without their testimony. The court stated:
>
> "The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule, does not *ipso facto* make its admission comply with the confrontation requirement. . . .
>
> "We have here not the routine record of a person's birth, or death, or body temperature, not any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible." [*Garlick*, 313 Md at 214, 220-221 (quotation marks and citation omitted).][31]

It is sufficient to observe that we too "are dealing with the opinions of a supposed expert witness[], who, in this document, [was] giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he [was] criminally responsible." *Id*. at 221.

Other courts have also recognized that not all hospital records can be treated in the same manner for purposes of the confrontation requirement and that psychiatric opinions, in particular, deserve special consideration. See, e.g., *Phillips v Neal*, 452 F2d 337, 347

---

[31] *Baber* cited *Garlick* favorably and quoted extensively from it.

(CA 6, 1971) (holding that admission of psychiatric hospital records opining on the sanity of the defendant violated the Confrontation Clause and noting the "danger which inheres in the introduction of records containing psychiatric diagnoses").[32]   Having never addressed this issue, the Supreme Court has never expressly adopted this approach to the admission of medical records for purposes of confrontation, but it certainly has never rejected it, and, as observed, several cases cited approvingly in *Melendez-Diaz* recognize

---

[32] The dissent contends that "[t]here is simply no principled distinction for applying the Confrontation Clause differently when analyzing psychiatric medical treatment than when analyzing medical treatment for 'physical' illnesses . . . ." *Post* at 24.  Other courts, including those cited favorably in *Melendez-Diaz*, disagree.  See, e.g., *Garlick*, 313 Md at 220-221.  We think that the distinction these courts discern is both plain and principled. For instance, see *New York Life Ins Co v Taylor*, 79 US App DC 66, 73-74; 147 F2d 297 (1945), in which the court articulated how psychiatric diagnoses are distinctive for purposes of confrontation:

> It is no reflection upon the profession of psychiatry to say that it necessarily deals in a field of conjecture.  Even in the diagnosis of actual insanity, cases are rare in which trained psychiatric witnesses do not come to opposite conclusions. . . .  It is difficult to conceive of records in which the right of cross-examination is more important than the conjectures of a psychiatrist on a psychoneurotic condition.

See also *Gregory*, 40 Md App at 326 ("Psychiatry—particularly the forensic branch of it—is an inexact science. . . .  Considering the less-than-certain and ever shifting state of the art, these opinions, given their ultimate potential effect, cry out for cross-examination."); *Phillips*, 452 F2d at 347 (explaining that the "danger" inherent in the introduction of psychiatric diagnoses without cross-examination is especially present when "the reports consist of opinions and conclusions which are stated without a detailed explication of either the facts or reasoning processes on which they are based"); *State v Cosgrove*, 181 Conn 562, 575 n 10436 A2d 33 (1980) (noting that "the best reasoned" cases that have held medical reports inadmissible "include those whose ratio decidendi appears to be that the opinions at issue in the reports are of kind which are frequently subject to varying interpretations").

this distinction.[33] Thus, contrary to the dissent, footnote 2 does not set forth a per se rule regarding the admissibility of medical records under the Confrontation Clause. If anything, such footnote suggests an altogether different legal standard when it is viewed in context and, in particular, when it is understood in light of the two cases which the Court in *Melendez-Diaz* selected from among the some 80 cases in Justice Kennedy's appendixes as the prime examples of medical reports that would not be testimonial within the meaning of the Sixth Amendment under its decision.

## C. DISSENT'S TEST

It is also important to comment on the dissent's test for determining whether an extrajudicial statement is testimonial. The dissent recognizes that the Supreme Court in *Crawford* "did not delineate the scope of testimonial statements" and that *Crawford* articulated several formulations of this concept. *Post* at 14. Nonetheless, the dissent proceeds to articulate its own test:

> In reviewing *Crawford* and its progeny, it becomes clear that the Court considers two related factors above all others when deciding whether an extrajudicial statement is testimonial, and therefore within the parameters of the Confrontation Clause: the *formality* of the statement within a criminal investigation or prosecution and the *purpose* of the statement. [*Post* at 15.]

While the dissent's test, in our judgment, constitutes a not-unreasonable attempt to synthesize several very-difficult-to-synthesize Confrontation Clause decisions of the

---

[33] In addition to *Baber* and *Garlick*, see, e.g., *United States v Oates*, 560 F2d 45, 81 (CA 2, 1977); *Henson v State*, 332 A2d 773, 776 n 8 (Del, 1975); *Manocchio v Moran*, 919 F2d 770, 780 n 17 (CA 1, 1990); *Reardon v Manson*, 491 F Supp 982, 986 (D Conn, 1980); *Cosgrove*, 181 Conn at 575 n 10; *State v Henderson*, 554 SW2d 117, 118 (Tenn, 1977).

Supreme Court, the test must be recognized for what it is-- an attempt to accord meaning to some very tortuous jurisprudence. The absence of any citation for the dissent's test underscores this reality. The dissent does not cite any Supreme Court decision in support of its "two-part test," because no such decision exists.

The Court's recent decision in *Bullcoming* does not alter this fact. In *Bullcoming*, 564 US at __; 131 S Ct at 2710, 2713, the Court affirmed the central holding of *Melendez-Diaz*-- that the right to confrontation applies to analysts who claim to have certified evidence from a machine or other objective scientific test-- and rejected the argument that the testimony of a "surrogate" expert was a constitutionally permissible substitute for the testimony of the individual who had actually conducted the test. Questions regarding the Court's confrontation clause jurisprudence persist after *Bullcoming*. See *id*. at __; 131 S Ct at 2725 (Kennedy, J., dissenting) ("Today's majority is not committed in equal shares to a common set of principles in applying the holding of *Crawford*."). However, at the very least, *Bullcoming* clearly reconfirmed that the Confrontation Clause bars the admission of a scientific report, prepared in connection with a criminal investigation or prosecution absent the testimony of the expert himself, regardless of the report's facial reliability and "even if [the scientists] possess the scientific acumen of Mme. Curie and the veracity of Mother Teresa." *Id*. at __; 131 S Ct at 2715 (majority opinion) (quotation marks and citation omitted.) In our judgment, Dr. Shahid's psychiatric opinions, which are necessarily grounded in subjective interpretations of the vagaries of the human mind, are at least as deserving of the

constitution's guaranteed protections of confrontation and cross-examination as the analyst's certification of a blood alcohol analysis in *Bullcoming*.  See *supra* at 35-37.[34]

To be clear, we agree with the dissent that "some meaning can—and must—be given to [the Supreme Court's confrontation] decisions."  *Post* at 15 n 40.  We too have parsed these cases to discern principles, and have come to what is, in our judgment, a reading that more accurately synthesizes the various holdings and that also adheres more closely to the actual language of the Confrontation Clause.  The dissent disagrees.  Specifically, it faults this opinion for "substitut[ing] an inquiry into the mere *foreseeability* of a statement's use at trial for an inquiry into the primary purpose for which the statement was created[, which] is simply contrary to the mandates of *Davis*, *Melendez-Diaz*, and most recently *Michigan v Bryant*."  *Post* at 19.  However, what the dissent disparages as "an inquiry into the mere *foreseeability* of a statement's use at trial," *post* at 19 is what *Crawford* expressly offered as one of three "formulations of [the] core class of 'testimonial' statements"-- statements that were made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"  *Crawford*, 541 US at 51-52.  *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2531-2532, reiterated and applied this exact language to determine

---

[34] Indeed, even the dissent in *Bullcoming*, which states that "the danger [to which the confrontation clause is addressed] is that innocent defendants may be convicted on the basis of unreliable, untested statements by those who observed—or claimed to have observed—preparation for or commission of the crime," seems more compatible with the result reached by this opinion than with that reached by the dissent. *Bullcoming*, 540 US at ___; 131 S Ct at 2726 (Kennedy, J., dissenting).

that the statement at issue in that case was testimonial. And no subsequent case has renounced this definition of a core testimonial statement.[35]

In place of such explicit direction, the dissent contends that it has been able to divine from Supreme Court decisions an alternative, exclusive test to determine whether a statement is testimonial-- "an inquiry into the primary purpose for which the statement was created." *Post* at 19. According to the dissent, this test is mandated by a proper application of *Davis*, *Melendez-Diaz*, and *Bryant*. See *post* at 19. Our reading of these cases is very different. As explained earlier, *Melendez-Diaz* definitely mandated no such thing. The words "primary purpose" are found nowhere in the opinion, and that opinion expressly reiterated and relied on *Crawford's* formulation of "testimonial."[36] And while

---

[35] The dissent asserts that this formulation, taken directly from *Crawford* and reiterated in *Melendez-Diaz*, does not resolve our case "because *Crawford*'s various potential definitions of 'testimonial' do not lead to a clear result one way or the other . . . ." *Post* at 25 n 69. We respectfully believe the dissent misreads *Crawford*. This decision cannot be read to require that a statement must fall within *all* of its "'[v]arious formulations of this core class of 'testimonial statements'" in order to be considered testimonial. *Crawford*, 541 US at 51. Indeed, the very statements at issue in *Crawford* hardly satisfied *all* the formulations because Sylvia Crawford's statements to the police in the course of an interrogation were clearly not, for example, "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[.]'" *Id*. at 51-52. The fact that a particular formulation does not apply to Dr. Shahid's report is hardly fatal to defendant's case because the Supreme Court does not require that, after we have identified that a statement is testimonial under an accepted formulation, we continue to apply *all* other formulations in sequence. To be clear, we do not treat as controlling any particular *Crawford* formulations. Rather, we simply recognize that the Court has expressly declined to adopt a single controlling definition of "testimonial," thereby leaving *all* of its formulations viable, one of which squarely applies to Dr. Shahid's report.

[36] The words that actually appear in *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2532, are "sole purpose." Specifically, the Supreme Court explained that "under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the

40

*Davis* and *Bryant* both employed a primary purpose inquiry to determine whether statements made to the police in the very specific context of an *ongoing emergency* were testimonial, those cases did not mandate that this was the exclusive test to be applied generally in Confrontation Clause cases. In fact, for the following reasons, we read *Davis* and *Bryant* as endorsing a quite different approach.

The primary purpose test was specifically crafted in *Davis* for the purpose of determining whether statements made in an ongoing-emergency context violated a defendant's right of confrontation. *Davis*, 547 US at 822. The test is relevant in that context, because generally the declarant is speaking to authorities *either* to obtain assistance in what is an ongoing emergency *or* "to establish or prove past events potentially relevant to later criminal prosecution." *Id*. Thus, the test is critical in the ongoing-emergency context because proper characterization of such statements will *always* prove decisive as to whether these statements are testimonial or not.

Apart from the fact that the "primary purpose" test has never been applied beyond the ongoing-emergency context, the specific "primary purpose" test articulated by the dissent is considerably different from the actual "primary purpose" test applied in *Davis*, 547 US at 822, which was as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

---

composition, quality, and the net weight' of the analyzed substance, Mass. Gen. Laws, ch. 111, § 13." *Id*. We address the relevance of these words later in this opinion.

41

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

This test obviously makes sense in the context for which it was specifically designed, emergency circumstances in which there is often ambiguity concerning the objectives or purposes of the declarant's utterances. However, outside that context, in more ordinary circumstances, the questions posed by the test are largely irrelevant, and the either/or characterization inherent in the limited context of the test is absent.[37] It is utterly unclear how a court would apply the "primary purpose" test outside the *Davis* context to a case in which no emergency is alleged-- what alternative "purposes" would be considered, and how would the resolution of which of these is "primary" bear in any meaningful way on the principles inherent in the Confrontation Clause?[38] A "primary purpose" test removed from its moorings would have little in common with the "primary purpose" test of *Davis* except for its nomenclature.

---

[37] *Melendez-Diaz* illustrates this point. In the context in which the statements in *Melendez-Diaz* were made, which involved state laboratory analysts preparing affidavits whose "sole purpose" was for use at a criminal trial, the Court did not engage, and could not, have engaged, in a "primary purpose" inquiry. Such an inquiry would have made no sense in that context since the affidavits in controversy had only one obvious and undisputed purpose.

[38] We are not persuaded by *State v Stahl*, 111 Ohio St 3d 186; 855 NE2d 834 (2006), or the cases from other jurisdictions relied on by the dissent. Not only does each of these concern sexual assault examinations, but it also appears that they represent the minority view. See *Hernandez v State*, 946 So 2d 1270, 1284-1285 (Fla App, 2007) (surveying the authority regarding whether a sexual assault victim's statement to a medical professional was testimonial and deciding, in conformity with the "weight of authority in other jurisdictions that have decided cases involving similar facts," that it was).

We find support for our decision not to extend the "primary purpose" test beyond the ongoing-emergency context for which it was created and apply it as the exclusive, controlling test in this new context in the very Supreme Court caselaw that the dissent claims "mandates" that we apply its test. In fact, one principle clearly emerging from *Davis* and *Bryant* is that the circumstances and context in which the statement was made are highly relevant, if not determinative, in deciding whether its admission offends the Confrontation Clause. See *Davis*, 547 US at 822, 827-830 (repeatedly emphasizing that statements are "testimonial when *the circumstances* objectively indicate that there is no such ongoing emergency") (emphasis added); *Bryant*, 562 US at ___; 131 S Ct at 1156 (explaining how a "new context" and circumstances "confront[ed] for the first time" affected its ruling). Indeed, the one thing that does seem clear from recent Confrontation Clause decisions is that the Supreme Court has very explicitly not adopted a bright-line test for determining whether a statement is testimonial, and instead has developed its jurisprudence on a case-by-case basis. See, e.g., *Crawford,* 541 US at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"); *Davis*, 547 US at 823 n 2 ("[O]ur holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.'"); *id.* at 830 n 5 ("We have acknowledged that our holding is not an 'exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation,' but rather a resolution of the cases before

43

us . . . .") (citation omitted); *Bryant*, 562 US at ___; 131 S Ct at 1158 (stating that whether a statement is testimonial requires a "highly context-dependent inquiry").[39]

For these reasons, we find little merit in the dissent's contention that *Davis*, *Melendez-Diaz*, and *Bryant* mandate that we exclusively rely on a primary purpose inquiry to determine whether use of Dr. Shahid's diagnosis, absent his testimony, implicated defendant's right of confrontation.[40]  In examining recent Supreme Court cases on which the dissent rests its decision, it is apparent that the dissent's reading of these cases is hardly mandated.  No Supreme Court decision has articulated the dissent's allegedly controlling "two-part test," and there is much language in each of the decisions relied on by the dissent to suggest that it is a test made out of whole cloth.

### D.  CONFRONTATION CLAUSE

We are not unsympathetic to the dissent's inability to fashion a single all-purpose Confrontation Clause test from recent Supreme Court decisions.  These decisions seem

---

[39] In his dissent in *Bryant,* Justice Scalia had further words concerning what he described as the "'highly context-dependent inquiry,'" which the majority employed.  See *Bryant*, 562 US at ___; 131 S Ct at 1175-1176 (Scalia, J., dissenting) ("[T]he admissibility of a statement now turns on 'a highly context-dependent inquiry' into the type of weapon the defendant wielded; the type of crime the defendant committed; the medical condition of the declarant; if the declarant is injured, whether paramedics have arrived on the scene; whether the encounter takes place in an 'exposed public area'; whether the encounter appears disorganized; whether the declarant is capable of forming a purpose; whether the police have secured the scene of the crime; the formality of the statement; and finally, whether the statement strikes us as reliable.") (citations omitted).

[40] Further, with regard to the dissent's second prong, the "*formality* of the statement within a criminal investigation or prosecution," *post* at 15, see n 11 of this opinion.  We do not think that the report is lacking in formality sufficient to exclude it from being considered "testimonial" under the Confrontation Clause.

not entirely consistent, they employ varying constitutional tests and formulations for discerning Confrontation Clause violations, they are lengthy and susceptible to having their language taken out of context, and the justices are sharply divided in these decisions, making it sometimes difficult to know which propositions of constitutional law have garnered the support of a majority of the Court.

Nonetheless, we believe that the dissent has erred in its deconstruction of a clause taken from a footnote in a sharply divided opinion of the Supreme Court and that, as a result, it has also erred in fashioning its own "exclusive" test synthesized from Supreme Court decisions, none of which has actually articulated that test and each of which has articulated language incompatible with that test. However difficult an exercise, this majority has also sought to abide by the direction of the Supreme Court and reached a very different result than the dissent.

We believe, though, that our analysis would be incomplete if we did not respond to the dissent's "two-part test" with an alternative analysis of our own. This analysis is drawn from the actual language of the Sixth Amendment of the United States Constitution. As the "supreme Law of the Land," US Const, art VI, cl 2, it seems appropriate to consult the actual language of the Constitution when Supreme Court caselaw is not altogether clear,

The Confrontation Clause of the Sixth Amendment of the United States Constitution reads, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." By its straightforward terms, the Confrontation Clause directs inquiry into two questions: (1) Does the person in

controversy comprise a "witness against" the accused under the Confrontation Clause; and (2) if so, has the accused been afforded an opportunity to "confront" that witness under the Confrontation Clause?

First, for the reasons set forth in part III(A) of this opinion, we believe the accused here has satisfied the first inquiry by demonstrating that Dr. Shahid constituted a "witness against" him. Indeed, we believe that Dr. Shahid was, by far, the most important "witness against" him. Dr. Shahid's diagnosis that defendant was not experiencing psychosis was employed by the prosecutor as substantive evidence that defendant was not, in fact, experiencing psychosis-- a psychosis, incidentally, that any member of the jury could probably have easily understood as having arisen as a function of a parent perceiving that a criminal perpetrator who had caused the needless death of his teenage child was unremorseful and unrepentant about the occurrence and that the legal system was satisfied to punish this perpetrator with a six-month misdemeanor. Dr. Shahid's report went to the heart of the ultimate issue at trial, upon which defendant's guilt or innocence under the law entirely turned, and it was relied on by every other significant expert witness testifying on behalf of the prosecution.

Second, for the reasons set forth in part III(A) of this opinion, we believe the accused here has satisfied the second inquiry by demonstrating that he had no opportunity to confront Dr. Shahid. The accused was never afforded the opportunity to cross-examine Dr. Shahid, therefore ensuring that the accused would be unable to question Dr. Shahid; that the accused would be unable to require that Dr. Shahid look him in the eye in open court, face-to-face, in the presence of the judge and jury and respond to

questions; and that the judge and jury would never be required to assess the demeanor, the assuredness, the expertise, and the credibility of Dr. Shahid.[41]

The use of Dr. Shahid's report against defendant absent any opportunity for cross-examination is exactly what the words of the Confrontation Clause prohibit-- however finely the dissent chooses to parse footnote 2 of *Melendez-Diaz*. By guaranteeing that "the accused shall enjoy the right . . . to be confronted with the witnesses against him," the Framers of the Confrontation Clause sought to guarantee that what happened at defendant's trial would not happen within our criminal justice system.

## V. CONCLUSION

Because we believe that defendant has been deprived of his right of confrontation under the Sixth Amendment, and because we believe he has suffered considerable

---

[41] The application of the plain error standard leads us to inquire into what Dr. Shahid might have said had he testified. What if, when asked to explain his diagnosis, he could not articulate his reasons? What if his rationale was not viewed as compelling? What if he had explained that his diagnosis of "no psychosis" did not necessarily mean that defendant was not legally insane at the time of the incident and that the prosecutor's expert had misinterpreted his diagnosis? What if, on the basis of new research or upon further reviewing defendant's medical files, he had modified his diagnosis? Or what if, on cross-examination standing face to face with defendant, he simply told the jury that he harbored some *doubts* about whether defendant *was* experiencing "psychosis," or might have lost touch with reality at the time of the incident? What if he was just an ineffectual witness? These hardly exhaust the list of "what ifs," the answer to any one of which might have altered the outcome of defendant's trial.

prejudice as a result, we reverse the judgment of the Court of Appeals, vacate defendant's convictions, and remand this case to the trial court for further proceedings.

> Stephen J. Markman
> Michael F. Cavanagh
> Marilyn Kelly
> Diane M. Hathaway (except footnote 15
>     and part IV)
> Mary Beth Kelly

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

No. 139856

CHARLES FACKELMAN,

      Defendant-Appellant.

_____

YOUNG, C.J. (*dissenting*).

The question posed by this case is: Can an out-of-court statement selectively used by a defendant in support of his principal defense serve as a predicate for a Confrontation Clause claim after the prosecutor has used the statement to impeach the defendant's expert? Defendant and the majority answer this question in the affirmative. I believe that the answer is unquestionably no and therefore dissent.

In this case, defendant's trial counsel declined to call as a witness the author of the out-of-court statement—a psychiatric evaluation—because he believed that the author would be a bad witness for the defense and would undermine the proffered insanity defense. This defense trial strategy proved partially successful; the jury found defendant guilty but mentally ill. On appeal, defendant now attempts to transform this conscious trial strategy into an "appellate parachute" by raising an ineffective assistance of counsel claim premised on an alleged Confrontation Clause violation because the author of the out-of-court statement, which defendant's own expert relied on and referred to, did not

testify at defendant's trial. Although our jurisprudence abhors sanctioning such appellate parachutes,[1] the majority here blesses this artful appellate strategy. I cannot.

These uncontested facts notwithstanding, United States Supreme Court caselaw is equally inconvenient to the majority's conclusion. Apart from the appellate parachute problem, the psychiatric evaluation that defendant claims violated his Confrontation Clause rights was not a testimonial out-of-court statement and therefore *did not even implicate the rights guaranteed by the Confrontation Clause*. The United States Supreme Court has made this perfectly clear: in *Melendez-Diaz v Massachusetts*, the Court expressly stated that "medical reports created for treatment purposes . . . would not be testimonial" statements within the meaning of the Sixth Amendment's Confrontation Clause.[2] Missed by the majority in this case is the fact that *none* of the nine justices who served on the *Melendez-Diaz* Court would have included medical reports created for treatment purposes in the definition of testimonial statements.[3] The psychiatric

---

[1] See *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000) ("Counsel may not harbor error as an appellate parachute.").

[2] *Melendez-Diaz v Massachusetts*, 557 US ___, ___ n 2; 129 S Ct 2527, 2533 n 2; 174 L Ed 2d 314 (2009).

[3] Justice Scalia's majority opinion, written on behalf of five justices, expressly stated that "medical reports created for treatment purposes . . . would not be testimonial under our decision today." *Id.* Justice Kennedy's dissenting opinion, written on behalf of the remaining four justices, would have limited testimonial statements to those "'produced by, or with the involvement of, adversarial government officials responsible for investigating and prosecuting crime.'" *Id.* at ___; 129 S Ct at 2552 (Kennedy, J., dissenting), quoting Comment, *Toward a definition of "testimonial": How autopsy reports do not embody the qualities of a testimonial statement*, 96 Cal L R 1093, 1118 (2008).

evaluation at issue in this case falls within that category of evidence considered to be nontestimonial because it was created to evaluate and treat defendant during his two-week hospitalization in a psychiatric intensive care unit.

Moreover, even if the psychiatric evaluation at issue were to be considered testimonial within the meaning of the Confrontation Clause, the prosecutor's purpose in referring to Dr. Shahid's evaluation was to impeach defendant's expert, a purpose that falls outside the purview of the Confrontation Clause.[4] Because neither the facts nor the law supports the majority's decision in this case, I would affirm the decision of the Court of Appeals, albeit for different reasons than the Court of Appeals articulated, and affirm defendant's convictions.

## I. FACTS AND PROCEDURAL HISTORY

This case involves defendant Charles Fackelman's emergency hospitalization at a Toledo, Ohio, psychiatric intensive care unit, beginning on March 29, 2007. Specifically, we are concerned with a psychiatric evaluation prepared by defendant's treating physician, Dr. Agha Shahid, during his hospitalization.

Defendant suffered from severe depression, including a suicide attempt, following the death of his teenage son in June 2006. Defendant's depression became particularly acute in the days leading up to his March 2007 hospitalization because it was the beginning of the baseball season for his son's high school team. While watching the team's game on March 27, 2007, defendant "began to cry" and "wave[d] . . . off" parents of his son's teammates from talking to him. Instead, he jogged to his car, drove home,

---

[4] *Crawford v Washington*, 541 US 36, 60 n 9; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

and locked himself in his room, which was something he did "occasionally when [he] didn't want to be seen."

The next day, defendant drove from his home in northern Ohio to confront the Monroe County man he believed responsible for his son's death, Randy Krell.[5] Defendant testified that he did not remember the incident. According to Krell, defendant arrived at Krell's home wielding a pistol.[6] He pointed the gun at Krell's chest and told Krell, "We're gonna talk." Defendant then directed Krell toward Krell's garage, all the while continuing to tell Krell that "we're gonna talk and end this all in about a minute." When defendant loaded the chamber of his pistol for firing, Krell ran across the street into his neighbor's house and asked his neighbor to call 911, which the neighbor did. Before the neighbor completed his 911 call, the neighbor heard "a loud crash" and his "entire doorframe came flying in and landed in . . . the entranceway . . . ." Still brandishing the weapon, defendant knocked the telephone out of the neighbor's hand and looked through the house for Krell, spending about 3½ or 4 minutes inside the house before leaving.

---

[5] Defendant's son was a passenger in a vehicle that was involved in a single-car accident. Krell was the driver of a second automobile that had been chasing the vehicle in which defendant's son was a passenger. Krell was convicted of negligent homicide for the death of defendant's son in that accident. Defendant testified that he was angry with Krell and that he "wanted to see him live in a cardboard box [for] the rest of his life." Defendant also admitted that, long before the March 2007 events resulting in his conviction, he harbored thoughts of confronting Krell and causing him physical pain. Krell testified that defendant had previously "lunged" at him during Krell's criminal trial.

[6] Although defendant testified that he did not remember what occurred on the afternoon and evening of March 28, 2007, he did not dispute the testimony of Krell or Krell's neighbor.

Defendant returned to his car without again confronting Krell.[7] Later that evening, defendant arrived at his mother's house in Toledo, walked over to a heat register, and placed the gun in the air duct. He also called his brother and asked him to "come and get it and get rid of it."[8] After he left his mother's house, defendant's family and friends became worried for his safety, and they began searching for him. Eventually, a family friend found defendant at a gas station in Bowling Green, Ohio. At the request of the family's attorney, the friend drove defendant to Flower Hospital in Toledo. Just outside the hospital, and apparently while the family attorney was finalizing defendant's admission into the hospital, police arrested defendant. Defendant was searched but then released from police custody for his hospitalization.

After spending the night of March 28-29, 2007, at Rescue Crisis Mental Health Services in Toledo, defendant was transferred back to Flower Hospital to be admitted into the psychiatric intensive care unit. Defendant was placed under the care and supervision of Dr. Shahid.

After interviewing and observing defendant, Dr. Shahid prepared a three-page "Psychiatric Evaluation" on Flower Hospital letterhead, which Dr. Shahid signed and dated March 31, 2007. The evaluation described defendant's history of present illness, past psychiatric history, medical history, family history, social history, mental status

---

[7] Krell testified that, after leaving his neighbor's house and calling 911 himself, he watched defendant enter his car, back out of Krell's driveway, and drive away from Krell's house.

[8] Defendant's brother and mother subsequently drove to a nearby quarry, and his brother threw the pistol into deep water at the quarry

examination, strengths and limitations, estimated length of hospitalization, diagnosis, and plan of treatment. Dr. Shahid concluded in this evaluation that defendant suffered from "[m]ajor depression," that it was a "single episode," and that it was "severe without psychosis."

Defendant was charged with first-degree home invasion,[9] two counts of felonious assault with a dangerous weapon,[10] and felony-firearm.[11] Defendant raised an insanity defense at his three-day jury trial. Defendant testified that he did not know how he ended up at Krell's house, that he did not remember chasing Krell, and that he did not remember knocking down the door of the neighbor's house. Furthermore, he testified that he did not remember going to his mother's house, hiding his gun, or talking to Dr. Shahid at Flower Hospital.

While presenting his case-in-chief, defendant called an expert witness, Dr. Zubin Mistry, who testified that defendant was legally insane at the time of the crime.[12] The prosecutor called a rebuttal expert witness, Dr. Jennifer Balay, who testified that defendant was legally sane. Both experts testified that they relied in part on Dr. Shahid's evaluation in forming their opinions about defendant's mental state. However, neither party called Dr. Shahid as a witness, nor did either party formally introduce his evaluation into evidence.

---

[9] MCL 750.110a(2).

[10] MCL 750.82.

[11] MCL 750.227b.

[12] The prosecutor presented no expert witness in his case-in-chief and had rested when defendant began his case-in-chief and presented his expert witness.

6

The jury found defendant guilty but mentally ill of all the charged offenses. On appeal, the Court of Appeals remanded this case to the trial court for a *Ginther* hearing on defendant's claim of ineffective assistance of counsel.[13] At the hearing, defendant's trial counsel testified that he did not object to the prosecutor's use of Dr. Shahid's evaluation because he thought the prosecutor was using the evaluation solely to impeach defendant's expert. Moreover, he explained, it did not occur to him that the use of the evaluation could violate the Confrontation Clause.[14] More important, he also testified that he "didn't want to call attention to" the evaluation and that he feared Dr. Shahid "would have been a bad witness if everything in that report would have come out . . . ."[15] The trial court concluded that defendant did not receive constitutionally ineffective assistance

---

[13] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[14] As the *first* proponent of the evaluation at trial, defense counsel's reaction to the Confrontation Clause claim advanced here is entirely understandable. The attempt to convert the use of this evaluation advanced by defendant himself into a Confrontation Clause violation seems plausible only to the majority.

[15] Not to be overlooked is the fact that defense counsel concluded that the entire evaluation, when considered as a whole, undermined the insanity defense that he was presenting and that Dr. Shahid probably would not have supported defendant's legal insanity defense. Defense counsel's trial strategy, therefore, was to minimize the importance of the evaluation, notwithstanding that his own expert selectively relied on it in formulating his opinion that defendant was legally insane.

Under the circumstances, it was entirely understandable why defense counsel would choose to rely on his own expert's opinion rather than jeopardize that opinion *and* the insanity defense by calling Dr. Shahid as a witness merely to authenticate his evaluation or to comply with MRE 703. Nor, for similar reasons, would defense counsel want to insist that the prosecutor call Dr. Shahid as a witness: once on the stand, Dr. Shahid would be subject to examination by the prosecutor and would undermine the insanity defense. The majority is apparently unconcerned about this very obvious trial strategy choice. The question is why.

7

of counsel and affirmed defendant's convictions. The Court of Appeals affirmed on the grounds that, although counsel had erred by allowing the prosecutor to use extrajudicial testimonial statements for the truth of the matter asserted, the error did not prejudice defendant. We granted defendant's application for leave to appeal.

## II. STANDARD OF REVIEW

Defendant claims that he received ineffective assistance of counsel after counsel failed to object to the use of Dr. Shahid's psychiatric evaluation. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel."[16] We review a trial court's findings of fact for clear error, while we review any underlying questions of constitutional law de novo.[17]

## III. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

This appeal is presented to us as a claim of ineffective assistance of counsel. Defendant claims that his trial counsel was constitutionally deficient for failing to object when the prosecutor questioned two expert witnesses about Dr. Shahid's psychiatric evaluation and referred to the evaluation in his closing statement.

---

[16] *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

[17] *Id.*

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right "to have the Assistance of Counsel for his defence."[18] "[T]he [United States Supreme] Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'"[19]

The United States Supreme Court has articulated two requirements for a defendant to establish that he is entitled to a new trial on the basis of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[20]

Defendant now claims that his trial counsel erred by allowing the prosecutor to question his expert and the prosecutor's rebuttal expert about Dr. Shahid's evaluation and to refer to Dr. Shahid's evaluation in his closing argument. This is an absurd proposition because

---

[18] US Const, Am VI. The Michigan Constitution's parallel provision uses nearly identical language. Const 1963, art 1, § 20 ("In every criminal prosecution, the accused shall have the right . . . to have the assistance of counsel for his or her defense . . . ."). This Court has held that the Michigan Constitution "does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of ineffective assistance of counsel." *People v Pickens*, 446 Mich 298, 302; 521 NW2d 797 (1994).

[19] *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984), quoting *McMann v Richardson*, 397 US 759, 771 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970).

[20] *Strickland*, 466 US at 687.

9

it was *defendant* who first raised the issue of his insanity and who first opened the door to questioning about Dr. Shahid's evaluation because his defense expert selectively relied on the evaluation during the defense's case-in-chief and because *defendant considered, but decided against, calling Dr. Shahid to the witness stand.* The majority does not explain why it would allow the defendant to rely on Dr. Shahid's evaluation without his being called as a witness, but preclude the prosecutor from using that same evaluation for impeachment and in rebuttal without calling Dr. Shahid as a witness.

Today's majority decision, thus, says in effect that a prosecutor is constitutionally required to call a particular witness—the author of an out-of-court statement—on the basis of the defense's selective use of that statement and conscious strategic decision *not* to call the author as a witness. The result of the majority's decision will be to promote trial and appellate gamesmanship.

The majority's decision flies in the face of the fact that a criminal defendant can waive his confrontation rights[21] and "[c]ounsel may waive an accused's constitutional rights for tactical reasons when the circumstances are not exceptional."[22] Counsel can also waive confrontation rights when he "purposefully and explicitly opens the door on a particular (and otherwise inadmissible) line of questioning" because "such conduct

---

[21] *Illinois v Allen*, 397 US 337, 342-343; 90 S Ct 1057; 25 L Ed 2d 353 (1970), quoting *Snyder v Massachusetts*, 291 US 97, 106; 54 S Ct 330; 78 L Ed 674 (1934).

[22] *United States v Lee*, 374 F3d 637, 650 (CA 8, 2004), citing *Loggins v Frey*, 786 F2d 364, 368 (CA 8, 1986). "Circumstances are exceptional when a defendant has not personally waived nor acquiesced in an attempted waiver by counsel." *Lee*, 374 F3d at 650.

operates as a limited waiver allowing the government to introduce further evidence on that same topic."[23]

Under the circumstances of this case, it is no surprise that defendant's trial counsel failed to object to the prosecutor's use of Dr. Shahid's evaluation to rebut defendant's insanity defense. I would hold that defendant affirmatively waived his right to confront Dr. Shahid because he chose, as a matter of trial strategy, not to call him as a witness.[24] Therefore, he cannot now claim that the *prosecutor's* failure to call Dr. Shahid as a witness on an issue for which the prosecutor bore no burden of proof violated his confrontation rights.[25]

Notwithstanding the issue of waiver, defendant claims that the prosecutor's use of Dr. Shahid's evaluation violated his Sixth Amendment right to confront the witnesses against him and the evidentiary rules regarding the introduction of hearsay. I will discuss defendant's legal claims seriatim.

---

[23] *United States v Lopez-Medina*, 596 F3d 716, 731 (CA 10, 2010). I do not concede that the prosecutor's rebuttal was an "otherwise inadmissible" line of questioning; however, this decision provides further support for the conclusion that defendant affirmatively waived cross-examination of Dr. Shahid.

[24] There is no evidence that defendant disagreed with his attorney's strategy. To the contrary, trial counsel admitted at the *Ginther* hearing that "[w]e had a discussion as to whether or not to . . . present Dr. Shahid" as a witness.

[25] For the reasons stated in part III(D) of this opinion, this trial strategy was objectively reasonable.

11

## B. CONFRONTATION CLAUSE

The Sixth Amendment to the United States Constitution provides, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." This right has been incorporated to the states under the Fourteenth Amendment.[26]

The Confrontation Clause seeks to prevent "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."[27] In its seminal Confrontation Clause decision, *Crawford v Washington*, the Supreme Court concluded that "the Framers would not have allowed admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."[28] While previous cases interpreting the Confrontation Clause emphasized the truth-seeking function of the right of confrontation,[29] the *Crawford* Court reoriented Confrontation

---

[26] *Pointer v Texas*, 380 US 400, 406; 85 S Ct 1065; 13 L Ed 2d 923 (1965). The Michigan Constitution's parallel provision uses nearly identical language. Const 1963, art 1, § 20 ("In every criminal prosecution, the accused shall have the right . . . to be confronted with the witnesses against him or her . . . .").

[27] *Crawford*, 541 US at 50.

[28] *Id.* at 53-54 (emphasis added).

[29] For example, in *Ohio v Roberts*, the Supreme Court explained the Confrontation Clause as follows: "Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Ohio v Roberts*, 448 US 56, 65; 100 S Ct 2531; 65 L Ed 2d 597 (1980), overruled by *Crawford*, 541 US 36, quoting *Snyder*, 291 US at 107.

Clause jurisprudence toward confrontation's procedural safeguards to ensure that "reliability be assessed in a particular manner: by testing in the crucible of cross-examination."[30]

The majority helpfully summarizes this conclusion in articulating what it styles an "alternative analysis"[31] for determining whether a Confrontation Clause violation has occurred: "(1) Does the person in controversy comprise a 'witness against' the accused under the Confrontation Clause; and (2) if so, has the accused been afforded an opportunity to 'confront' that witness under the Confrontation Clause?"[32] Far from being an alternative analysis, these two questions simply assert uncontested constitutional first principles. Thus, the majority's alternative analysis does not answer the difficult and fact-intensive inquiry required to review this case.

As the majority's test illustrates, and as the *Crawford* Court held, the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'"[33] *Crawford* emphasized the qualitative distinction between testimonial statements and nontestimonial statements for purposes of applying the Confrontation Clause:

---

[30] *Crawford*, 541 US at 61. In abrogating the *Roberts* test, the *Crawford* Court explained that *Roberts* "departs from the historical principles" of the Confrontation Clause because it "admits statements that . . . consist of *ex parte* testimony upon a mere finding of reliability." *Id.* at 60.

[31] *Ante* at 45.

[32] *Ante* at 45-46.

[33] *Crawford*, 541 US at 51, quoting 2 Webster, An American Dictionary of the English Language (1828).

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . .  Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.[34]

Therefore, any case that applies the Confrontation Clause must determine, as a threshold matter, whether the statement at issue is testimonial.

## 1.  WHAT CONSTITUTES "TESTIMONY"?

*"[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today."*

*—Melendez-Diaz v Massachusetts* (2009)[35]

"Testimony" is "'[a] *solemn* declaration or affirmation made for the purpose of establishing or proving some fact.'"[36]  The Court explained that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not," and concluded that "[t]he constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement."[37]

Although it did not delineate the scope of testimonial statements, the *Crawford* Court acknowledged that "[v]arious formulations of this core class of 'testimonial'

---

[34] *Crawford*, 541 US at 68.

[35] *Melendez-Diaz*, 557 US at ___n 2; 129 S Ct at 2533 n 2.

[36] *Id.* at 51, quoting 2 Webster, An American Dictionary of the English Language (1828) (alteration in *Crawford*) (emphasis added).

[37] *Crawford*, 541 US at 51.

statements exist,"[38] and instead of choosing one, it "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'"[39] In reviewing *Crawford* and its progeny, it becomes clear that the Court considers two related factors above all others when deciding whether an extrajudicial statement is testimonial, and therefore within the parameters of the Confrontation Clause: the *formality* of the statement within a criminal investigation or prosecution and the *purpose* of the statement.[40] Formal statements created as part of the investigative or judicial process—such as statements that are "quite plainly affidavits"—are testimonial.[41] Similarly, statements that are made for the express purpose of investigating and prosecuting crimes—such as a statement "the *sole purpose* of [which] was to provide 'prima facie evidence of the composition, quality, and the net

---

[38] *Id.*

[39] *Id.* at 68.

[40] Notwithstanding the majority's characterization to the contrary, this articulation is less a strict "'two-part test,'" *ante* at 38, than a summation of factors that the United States Supreme Court has considered most relevant in determining whether a statement is testimonial for confrontation purposes. The majority is correct that this summation is an "attempt to synthesize several very-difficult-to-synthesize Confrontation Clause decisions of the Supreme Court," *ante* at 37-38, but as the analysis in this opinion indicates, I believe that those decisions contain a consistent pattern and that, as a result, some meaning can—and must—be given to those decisions.

[41] *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2532. And even if formality "is not the sole touchstone" in the inquiry into whether a statement is testimonial, *Michigan v Bryant*, 562 US ___, ___; 131 S Ct 1143, 1160; 179 L Ed 2d 93 (2011), "a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial," *Bullcoming v New Mexico*, 564 US ___, ___; 131 S Ct 2705, 2721; 180 L Ed 2d 610 (2011) (Sotomayor, J., concurring).

weight' of the analyzed substance"—are likewise testimonial.[42]  Contrarily, statements made for some other primary purpose—such as responses to interrogations in order "to enable police assistance to meet an ongoing emergency"[43] or "medical reports created for treatment purposes"[44]—are not testimonial.  This last example, specifically referenced in *Melendez-Diaz*, is particularly relevant to the instant case.

In deconstructing this reference in *Melendez-Diaz*, the majority claims that this dissent fails to account for the final phrase of footnote 2—"'under our decision today'"[45]—and it argues that, instead, "the circumstances under which a medical report created for treatment purposes could be considered testimonial was simply left for another day."[46]  In fact, the *Melendez-Diaz* majority was responding to Justice Kennedy's concern that the core holding of *Melendez-Diaz* would create unintended consequences.[47]  Moreover, while the context of the *Melendez-Diaz* majority's decision supports the

---

[42] *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2532, quoting Mass Gen Laws, ch 111, § 13; see also *Bullcoming*, 564 US at ___; 131 S Ct 2716 (stating that "[t]he same purpose [as the certificate in *Melendez-Diaz*] was served by the certificate in question here"); accord *id.* at ___; 131 S Ct 2722 (Sotomayor, J., concurring) ("[T]his is not a case in which the State suggested an alternate purpose, much less an alternate *primary* purpose, for the [blood alcohol concentration] report.").

[43] *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006); see also *Bryant*, 562 US ___; 131 S Ct 1143.

[44] *Melendez-Diaz*, 557 US at ___ n 2; 129 S Ct at 2533 n 2.

[45] *Ante* at 33, quoting *Melendez-Diaz*, 557 US at ___ n 2; 129 S Ct at 2533 n 2.

[46] *Ante* at 33.

[47] *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2546 (Kennedy, J., dissenting) ("It is difficult to confine at this point the damage the Court's holding will do in other contexts.").

16

interpretation that this opinion attaches to footnote 2, *all* the caselaw applying *Crawford* and its progeny attaches great significance to the broader proposition that the footnote applies: a statement's *primary purpose* is accorded great weight in the determination whether the statement is testimonial in nature.[48] In the end, while the facts of this case were not squarely before the Court in *Melendez-Diaz*, the *Melendez-Diaz* majority's statement that "medical reports created for treatment purposes . . . would not be testimonial under our decision today" is highly instructive regarding how to apply Confrontation Clause principles to the facts of the instant case.

There are also a number of instructive state supreme court cases that illustrate the *Melendez-Diaz* Court's recognition that "medical reports created for treatment purposes" are not testimonial.[49] For instance, in *People v Cage*, the California Supreme Court held that a victim's statement to his doctor at a hospital was not testimonial because it was made for the purpose of "immediate acute treatment"[50] and not to bear testimony against the defendant. Alternatively, in *Hartsfield v Commonwealth*, the Kentucky Supreme Court held that a statement made to a sexual assault nurse examiner was testimonial because the purpose of the questioning was to "elicit[] evidence of past offenses with an

---

[48] The majority itself affirms this proposition in its discussion of the recent decision in *Bullcoming*, stating that the *Bullcoming* Court "clearly reconfirmed that the Confrontation Clause bars the admission of a scientific report, *prepared in connection with a criminal investigation or prosecution . . . .*" *Ante* at 38 (emphasis added). The majority, however, reads *Bullcoming* too broadly when it would apply *Bullcoming*'s analysis to statements prepared for purposes *other than* to aid a criminal investigation or prosecution. *Bullcoming* simply does not apply to cases like defendant's.

[49] *Melendez-Diaz*, 557 US at ___ n 2; 129 S Ct at 2533 n 2.

[50] *People v Cage*, 40 Cal 4th 965, 986; 56 Cal Rptr 3d 789; 155 P3d 205 (2007).

17

eye toward future criminal prosecution," making the nurse "an active participant in the formal criminal investigation."[51]

The Ohio Supreme Court's decision in *State v Stahl* perhaps most fully explained a court's inquiry into the purpose of a statement.[52] It held that, although a forensic nurse working in an emergency room "serves a prosecutorial function by collecting evidence," that function is "at best secondary to the . . . primary motivation, the care of [the unit's] patients."[53] The court went on to explain:

> [The defendant] asserts that [the nurse's] taking of evidence, which included swabbing for DNA with the help of ultraviolet light, taking pictures of [the victim's] mouth, and taking a napkin that [the victim] used after the incident, demonstrates the . . . unit's prosecutorial purpose and renders [the victim's] statements testimonial. Emergency rooms routinely perform these procedures, and a witness in this situation could reasonably believe that the . . . unit's medical examination, including the incident history statement, serves primarily a medical function.[54]

In distinguishing an emergency room nurse's "primary" and "secondary" functions, the *Stahl* court answered the majority's concern that "[i]t is utterly unclear how a court would apply the 'primary purpose' test outside the *Davis* context to a case in which no emergency [requiring immediate police assistance] is alleged" and its questions regarding "what alternative 'purposes' would be considered, and how would the resolution of

---

[51] *Hartsfield v Commonwealth*, 277 SW3d 239, 244 (Ky, 2009).

[52] *State v Stahl*, 111 Ohio St 3d 186; 2006-Ohio-5482; 855 NE2d 834 (2006).

[53] *Id.* at 196-197.

[54] *Id.* at 198.

18

which of these is 'primary' bear in any meaningful way on the principles inherent in the Confrontation Clause[.]"[55]

These cases and others reiterate the United States Supreme Court's acknowledgment in *Melendez-Diaz* that statements made for the purposes of diagnosing and treating medical emergencies are not testimonial, while recognizing statements that carry an investigative purpose and that turn medical professionals into "active participant[s] in the formal criminal investigation" can create testimonial statements, even if they are created by medical professionals.[56] The majority has not followed this line of analysis. Instead, it substitutes an inquiry into the mere *foreseeability* of a statement's use at trial for an inquiry into the primary purpose for which the statement was created. The majority's analysis is simply contrary to the mandates of *Davis*, *Melendez-Diaz*, and most recently *Michigan v Bryant*.[57] Thus, the majority of this Court

---

[55] *Ante* at 42.

[56] *Hartsfield*, 277 SW3d at 244. While these cases from other courts apply the purpose analysis to victims' treatment for injuries, rather than to defendants' treatment, this distinction is without a difference because courts are required to examine the declarant's purpose when determining whether the statement was made for the purposes of medical treatment. *Davis*, 547 US at 823 n 1 ("[I]t is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."). A declarant-victim telling a doctor what occurred so the doctor can treat her is in no different a position than a declarant-doctor documenting a medical evaluation so he can treat a criminal defendant.

[57] *Bryant*, 562 US ___; 131 S Ct 1143.

19

continues to misapply the Confrontation Clause caselaw of the United States Supreme Court.[58]

## 2. APPLICATION

In light of the foregoing analysis of Confrontation Clause jurisprudence, the statement at issue in this case was not testimonial because it was neither formal nor created for the primary purpose of investigating or prosecuting crimes.[59] As stated, the declarant, Dr. Shahid, treated defendant during his hospitalization in Flower Hospital's psychiatric intensive care unit for an acute psychiatric episode.[60] In rendering emergency

---

[58] The majority criticizes this opinion for not limiting inquiry into the primary purpose of a statement to the narrow question "whether statements made to the police in the very specific context of an *ongoing emergency* were testimonial . . . ." *Ante* at 41. However, the majority's narrow approach ignores the fact that cases in addition to *Davis* and *Bryant* have considered a statement's purpose in determining whether its introduction violates the Confrontation Clause. Indeed, in *Melendez-Diaz*, it was not just the "primary" purpose of the affidavits identifying the tested substance that they be used at trial, but it was their "sole purpose." *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2532 (emphasis omitted).

[59] Formality in the confrontation context corresponds to a statement's specific role within the investigative or prosecutorial process. Justice Thomas perhaps articulated this principle most clearly in his separate *Melendez-Diaz* opinion, wherein he explained that "'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized *testimonial materials*, such as affidavits, depositions, prior testimony, or confessions.'" *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2543 (Thomas, J., concurring) (emphasis added), quoting *White v Illinois*, 502 US 346, 365; 112 S Ct 736; 116 L Ed 2d 848 (1992) (Thomas J., concurring).

[60] In concluding that Dr. Shahid's evaluation was testimonial, the Court of Appeals operated under the presumption that *defendant*, and not Dr. Shahid, was the declarant. "[L]ike a statement taken by a police officer during a custodial interrogation, the statements attributed to defendant by Dr. Shahid appear to be responses to questions posed by Dr. Shahid for purposes of defendant's psychiatric examination." *People v Fackelman*, unpublished opinion per curiam of the Court of Appeals, issued August 27, 2009 (Docket No. 284512), p 2. The Court of Appeals erred in presuming that defendant

20

psychiatric treatment to a patient who had already attempted suicide once before and who continued to exhibit severe depression, Dr. Shahid created a detailed evaluation that outlined defendant's medical condition and determined the most appropriate course of emergency treatment.

Because the context and contents of the entire evaluation are essential to determining whether it is testimonial, the Appendix to this opinion contains the evaluation with minor redactions.[61] In order to treat defendant, Dr. Shahid had to understand his patient's medical and psychiatric history, particularly in a situation in which his patient had previously attempted to commit suicide, had been admitted on an emergency basis in a severely depressed state, and continued to express suicidal ideation.

Thus, Dr. Shahid interviewed defendant regarding every aspect of his illness, in particular, its origin in the death of defendant's son and the continuing effect of that death on defendant's mental state. This required Dr. Shahid to ask defendant, not only about his son's death generally, but also, more specifically, what he remembered about the incident with Krell. Dr. Shahid determined that defendant "feels helpless, hopeless and

---

was the "declarant" for the purposes of his Confrontation Clause challenge. Dr. Shahid was the declarant whose diagnosis of defendant is at issue in this appeal.

[61] I agree with the majority that "the circumstances and context in which the statement was made are highly relevant, if not determinative, in deciding whether its admission offends the Confrontation Clause." *Ante* at 43. This is precisely why the purpose of a statement's creation matters so much to the inquiry into whether a statement is testimonial, and why this dissent's analysis focuses on the context and contents of Dr. Shahid's evaluation. By contrast, the majority opinion focuses on how that evaluation, once produced for any reason unrelated to litigation, might likely be used in a future criminal prosecution.

21

worthless" but is "[o]riented to time, place and person."  In short, the evaluation documented defendant's mental and physical state at the time of the evaluation—his mood, affect, temperature, pulse, respiration, and blood pressure—and provided a diagnosis and plan of treatment for the periods during and after defendant's hospitalization.

Important for our analysis is the fact that Dr. Shahid's evaluation did not end with his diagnosis of defendant; rather, it followed that diagnosis with a *plan of treatment*. After diagnosing defendant's depression as "severe without psychosis," Dr. Shahid concluded that defendant should "[c]ontinue Prozac" and "add Seroquel," a drug used to "help patient with sleep, agitation and his complaint that he cannot shut his mind." Dr. Shahid also determined that defendant should continue with psychotherapy after his discharge.

All these facts lead inexorably to the conclusion that Dr. Shahid's primary purpose in undertaking and documenting defendant's psychiatric evaluation was to provide medical care and treatment, not to serve as "an active participant in the formal criminal investigation" or prosecution.[62]  The evaluation was, therefore, created not in anticipation of litigation, but in anticipation of continued treatment.

The majority emphasizes that Dr. Shahid's evaluation noted that "the Monroe County sheriff want[ed] to be called when [defendant] is discharged to home" and that defendant "ha[d] legal charges against him through the State of Michigan 38th Judicial Circuit . . . ."  The fact that Dr. Shahid was aware of the pending criminal charges against

_____

[62] *Hartsfield*, 277 SW3d at 244.

22

defendant does not alter Dr. Shahid's primary purpose in preparing his evaluation: to render emergency psychiatric treatment to defendant. Moreover, there was no indication that his treatment was handled any differently because of the pending charges, and the acknowledgment of the charges constitutes a legitimate part of the patient's history that is a customary part of psychiatric evaluations. Indeed, it would be passing strange for the evaluating psychiatrist to fail to note the conditions under which the patient was referred to the psychiatric emergency room in the first instance. This is essentially a passing reference in an evaluation that is otherwise entirely devoted to recording and treating defendant's psychiatric emergency, including an emphasis on defendant's suicidal ideation. Significantly, and undercutting the majority's foreseeability analysis, there is no evidence, other than being aware that defendant had been arrested for assaulting Krell, that Dr. Shahid had any other contact with the police or the prosecutor in this case.

The majority itself quotes the evaluation's introductory statement that defendant "'had suicidal thoughts.'"[63] Dr. Shahid emphasized the suicidal ideation later in his evaluation, repeating that defendant had attempted suicide by drug overdose and stating that defendant continued to exhibit suicidal ideation—defendant "stated that he thinks about suicide 'all the time.'" Moreover, Dr. Shahid explained that defendant "was transferred to the psychiatric intensive care unit for his safety since the patient was thinking intensely about suicide, and he just does not want to live anymore."

Also, the majority distinguishes the psychiatric treatment that defendant received from other medical treatment and suggests that this distinction is determinative in

---

[63] *Ante* at 16.

23

confrontation cases.[64]  This distinction confuses the *purpose* of documenting a psychiatric

evaluation with its potential *effect* on future proceedings.  Not only has the United States

Supreme Court "never addressed" this issue,[65] at least one state court that considered it

after *Crawford* (albeit in dicta) made no distinction between psychiatric treatment and

other medical treatment.[66]  There is simply no principled distinction for applying the

Confrontation Clause differently when analyzing psychiatric medical treatment than

when analyzing medical treatment for "physical" illnesses—particularly because courts

must examine the *purpose* for which an out-of-court medical statement was created.  As

stated, Dr. Shahid explained in his evaluation that defendant was admitted to the

psychiatric intensive care unit "for his safety" because he "was thinking intensely about

suicide . . . ."  Thus, the purpose of Dr. Shahid's emergency care and treatment of

defendant was no different than an emergency room physician's treatment of a person

with life-threatening physical injuries: the immediate stabilization of the patient.

The majority's determination that Dr. Shahid's evaluation was testimonial runs

contrary to the United States Supreme Court's Confrontation Clause caselaw on the

matter.  **The Court stated in *Melendez-Diaz* that "medical reports created for**

**treatment purposes" are not testimonial, a position to which the *entire* Court**

---

[64] See *ante* at 35-37.

[65] *Ante* at 36.

[66] *Commonwealth v Baumhammers*, 599 Pa 1, 60 n 28; 960 A2d 59 (2008) (explaining that statements made to an expert witness by the defendant's former psychologist, among other statements, were "not 'testimonial' hearsay as contemplated by the Court in *Crawford*").

**subscribed**.[67]  In holding to the contrary, the majority places great weight on the fact that, because Dr. Shahid was aware of and acknowledged the pendency of charges against defendant, an "'"objective [psychiatrist] would reasonably [be led] to believe that [his statements] would be available for use at a later trial."'"[68]  Notwithstanding the fact that the standard that the majority quotes is not the standard of law that is binding on our decision today,[69] the majority fails to give appropriate credence to Dr. Shahid's efforts to

---

[67] See n 3 *supra*.

[68] *Ante* at 16, quoting *Crawford*, 541 US at 51.

[69] The majority treats as controlling a standard that the United States Supreme Court has not adopted, applying one of the three *possible* formulations that the *Crawford* Court noted had been used to define testimonial statements.  However, the *Crawford* Court *expressly declined* to choose one of the three methods as controlling, noting only that "interrogations by law enforcement officers fall squarely within" the class of testimonial statements, however it is defined.  *Crawford*, 541 US at 53.  Moreover, one of the other formulations that the *Crawford* Court identified as a potential definition of "testimonial"—"'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,'" *id.* at 51-52, quoting *White*, 502 US at 365 (Thomas, J., concurring)—leads to the result of this dissenting opinion, not the majority's result.  Contrary to the majority's observation, see *ante* at 40 n 35, the *Crawford* majority, including Justice Thomas, concluded that this narrowest definition of "testimonial" included the statements at issue in *Crawford*.  Thus, if it is "hardly fatal" to the majority's position that this alternative formulation would result in the conclusion that the statement at issue in this case was not testimonial, *ante* at 40 n 35, then it is equally nonfatal to this dissent's position that the majority's preferred formulation would lead to the conclusion that the statement at issue in this case was testimonial.  In short, because *Crawford*'s various potential definitions of "testimonial" do not lead to a clear result one way or the other regarding how to apply the Confrontation Clause in this case, we must examine how the Court has applied and refined its understanding of the Confrontation Clause after *Crawford*.

The majority claims that *Melendez-Diaz* employed its preferred test "to ascertain that the statement at issue was testimonial[.]"  *Ante* at 16.  However, like the *Crawford* Court, the *Melendez-Diaz* Court reiterated the fact that "'[v]arious formulations of this

25

diagnose defendant's medical problem and to create a treatment plan, efforts that were clearly articulated in the evaluation. The evaluation itself acknowledged that defendant would be hospitalized for "10-14 days" and would be receiving both prescription medications and psychotherapy during and after his hospitalization. In reading Dr. Shahid's entire evaluation, it is hard to conclude, as the majority does, that Dr. Shahid was *primarily* concerned with anything other than defendant's mental health.

As stated, the *Melendez-Diaz* Court affirmed the nontestimonial nature of medical reports created for treatment purposes. *Melendez-Diaz* emphasized that reviewing courts must examine the *primary purpose* of the statement's creation when determining whether it runs afoul of the Confrontation Clause. The majority has not provided any indication that Dr. Shahid did anything other than treat defendant for his severe depression.

### 3. IMPEACHMENT

Even if, contrary to my conclusion above, Dr. Shahid's evaluation was testimonial in nature, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[70] Accordingly, notwithstanding the majority's suggestion that we should not engage in what it terms "mental gymnastics" in determining whether the prosecutor's use of Dr. Shahid's

---

core class of testimonial statements exist,'" without expressly adopting one. *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2531-2532, quoting *Crawford*, 541 US at 51.

[70] *Crawford*, 541 US at 60 n 9, citing *Tennessee v Street*, 471 US 409, 414; 105 S Ct 2078; 85 L Ed 2d 425 (1985).

26

evaluation was to prove the truth of the matter asserted,[71] that is just the type of analysis that the United States Supreme Court's Confrontation Clause jurisprudence requires.

In order to meet his burden of proving by a preponderance of the evidence that he was legally insane at the time of the crimes,[72] defendant presented the testimony of Dr. Mistry. On direct examination, Dr. Mistry admitted that he reviewed "records from Flower Hospital, Dr. Shahid's records . . . ." Dr. Mistry's admission that he reviewed Dr. Shahid's records opened the door to inquiry about how Dr. Shahid's records influenced Dr. Mistry's expert opinion, including any points of disagreement between his opinion and the information contained in Dr. Shahid's evaluation.

Far from "[going] well beyond the scope of the direct examination," the prosecutor appropriately sought to undermine the opinion proffered by defendant's expert, that the defendant was legally insane, by using Dr. Shahid's evaluation to impeach that opinion.[73] And Dr. Shahid's evaluation was a powerful tool for impeachment because Dr. Shahid concluded that defendant did not suffer from psychosis when he evaluated him shortly after the crimes were committed.[74] Having read Dr.

---

[71] *Ante* at 14 n 10.

[72] MCL 768.21a(3).

[73] *Ante* at 13-14.

[74] In order to prove legal insanity, MCL 768.21a(1) requires a showing that the defendant "lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." I agree with the majority's observation that "[a]t trial, the medical term that both testifying experts used as shorthand for describing legal insanity was 'psychosis . . . .'" *Ante* at 12-13. See also 2 *Shorter Oxford English Dictionary* (6th ed), p 2392 (defining "psychosis"

Shahid's evaluation and records in reaching his own opinion, Dr. Mistry was properly compelled by the prosecutor's impeachment to explain how he came to an entirely different conclusion than the treating physician concerning the defendant's mental status at the time of the crimes.

The majority's extensive quotations from the trial transcripts indicate nothing to the contrary: Dr. Mistry confirmed that he reviewed Dr. Shahid's evaluation, including Dr. Shahid's diagnosis of defendant, and indicated that he disagreed with that diagnosis because of his review of the entire record, including information that Dr. Shahid did not have at his disposal. And yet, notwithstanding these extensive quotations, the majority does not provide sufficient context to understand the nature of the prosecutor's cross-examination.[75] That context shows that the prosecutor initially sought to use factual information contained in Dr. Shahid's evaluation that conflicted with Dr. Mistry's own

---

as "severe mental illness, derangement, or disorder involving a loss of contact with reality").

[75] Importantly, the prosecutor's entire cross-examination did not involve Dr. Shahid's evaluation; rather, the entire cross-examination was focused on impeaching Dr. Mistry's opinion. The prosecutor raised other points completely unrelated to Dr. Shahid's evaluation in an effort to show that Dr. Mistry's opinion did not incorporate relevant data. For instance, the prosecutor elicited testimony from Dr. Mistry that he did not view the video captured by a home-surveillance system that "shows, at least partially, what the Defendant was actually doing at the time of the crime," although Dr. Mistry admitted that review of that video "would be helpful" to any conclusion regarding defendant's state of mind at the time of the crime. The prosecutor also questioned Dr. Mistry regarding defendant's behavior at his mother's house, including defendant's actions to conceal the gun in his mother's heat register. Dr. Mistry explained that, while he had not interviewed defendant's mother, he was aware that defendant "put the gun at his mother's house" and explained that a "deliberate effort to conceal" the gun would be a significant fact in evaluating defendant's mental status at the time of the crimes.

28

observations and proves the impeachment purpose of questioning Dr. Mistry about the evaluation.

One of the points of conflict between Dr. Mistry's testimony and Dr. Shahid's evaluation was the extent to which defendant remembered what occurred on the afternoon of March 28, 2007. As part of his inquiry into defendant's mental state, Dr. Mistry interviewed defendant, who explained that "[h]e had no recollection of the events of that time[,] only what he heard from other people." It was in challenging this point that the prosecutor first discussed the substance of Dr. Shahid's evaluation. After confirming that Dr. Mistry had read Dr. Shahid's evaluation, the prosecutor asked Dr. Mistry whether he was aware that defendant had explained to Dr. Shahid "that on the day that this happened he wanted [Krell] to feel my pain" and that defendant stated "that he remembers stopping his car and seeing that person who [defendant] believes was responsible for his son's death, and stated that that person took off in the street and, quote: I followed him across the street."

The prosecutor sought to impeach Dr. Mistry's credibility as an expert on the basis of these conflicting statements by defendant. This is evident from the prosecutor's suggestion that defendant had "a motivation not to tell the full truth [to Dr. Mistry] about his memory" because Dr. Mistry could help defendant's case "if he reaches a certain conclusion . . . ." While Dr. Mistry denied that defendant had lied to him regarding his lack of memory, he admitted that part of his diagnosis required him "to develop an opinion as to whether [defendant] is being sincere or whether [he's] misconstruing things or lying in order to paint a picture to you of [himself] in a certain way."

29

It was only after this point that the prosecutor cross-examined Dr. Mistry regarding Dr. Shahid's diagnosis. Thus, after raising the *factual* differences between Dr. Shahid's psychiatric evaluation session with defendant at the hospital and Dr. Mistry's later pretrial interview with defendant, the prosecutor sought to link those factual differences to the different diagnoses themselves. Indeed, the prosecutor asked Dr. Mistry whether he could "point to anything specific in [Dr. Shahid's evaluation] where you . . . can say he made a mistake," and Dr. Mistry could not. Rather, Dr. Mistry "[didn't] disagree with Dr. Shahid on his observations," only "as to the diagnosis."

In short, the prosecutor's use of Dr. Shahid's evaluation during his cross-examination of Dr. Mistry was for the purpose of impeaching Dr. Mistry's expert opinion, not to prove the truth of Dr. Shahid's evaluation.

However, the prosecutor did not just refer to Dr. Shahid's evaluation during his cross-examination of Dr. Mistry. The prosecutor also referred to the evaluation during his direct examination of his rebuttal expert witness, Dr. Balay. As with his cross-examination of Dr. Mistry, the prosecutor highlighted the differences between Dr. Shahid's psychiatric session with defendant and Dr. Balay's psychiatric interview of defendant. Dr. Balay explained that defendant "claimed to basically have no memory of any of the events" that occurred on the afternoon of March 28, 2007, even though she acknowledged that defendant had described to Dr. Shahid some memories from that afternoon. Dr. Balay then explained to the prosecutor that defendant could either be suppressing the memories or "just be lying," but that she "[had] no way of knowing one way or the other." In the end, Dr. Balay indicated that she agreed with Dr. Shahid's conclusion that defendant was not psychotic. She also stated that she disagreed with

30

Dr. Mistry's conclusion and explained her reasons for doing so. In particular, she determined that defendant had acted methodically in pursuit of his stated motive—that he "was furious at this man who he believed had caused the death of his son"—and that such methodical behavior is "the most relevant" factor in determining whether a person is able to conform his conduct to the requirements of the law. As with the cross-examination of Dr. Mistry, the purpose of the direct examination of Dr. Balay was to impeach Dr. Mistry's credibility and not necessarily to assert that Dr. Shahid's diagnosis was true.

Finally, the prosecutor referred to Dr. Shahid's evaluation during his closing argument, explaining that "it's real important to look at what Dr. Shahid had to say, even though he didn't testify here before you" and emphasizing that Dr. Shahid "reached the conclusion at the end [of] his examination that Mr. Fackelman was depressed, he had severe depression, but that there was no psychosis involved." However, this does not change the fact that during defendant's case-in-chief, the prosecutor used Dr. Shahid's evaluation for a proper impeachment purpose rather than to prove the truth of the matter asserted. Moreover, the trial court explained that "lawyers' statements and arguments are not evidence" and that "[e]vidence includes only the sworn testimony of witnesses, the exhibits which were admitted into evidence, and anything else I told you to consider as evidence."[76] Because Dr. Shahid's evaluation meets none of these criteria, and because "jurors are presumed to follow their instructions,"[77] I cannot conclude that the prosecutor's closing argument prejudiced defendant. The trial court's cautionary

---

[76] See CJI2d 3.5(2) and (5).

[77] *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

31

instruction properly insulated the jury from any inappropriate use of Dr. Shahid's evaluation during closing argument.

Because the majority seriously errs in applying United States Supreme Court Confrontation Clause precedent to the instant case, I respectfully dissent and would hold that Dr. Shahid's medical evaluation was not testimonial and, therefore, not subject to the Confrontation Clause. Moreover, even if Dr. Shahid's evaluation were testimonial, it was primarily used not to prove the truth of the matter asserted, but to impeach defendant's expert witness. Accordingly, defendant's trial counsel did not err by failing to raise a Confrontation Clause objection to Dr. Shahid's evaluation.

## C. HEARSAY

Even if Dr. Shahid's evaluation is not subject to the Confrontation Clause, it is still subject to the Michigan Rules of Evidence, including our evidentiary rules regarding hearsay. However, because counsel is not ineffective for failing to raise futile objections,[78] we must determine whether any objection to Dr. Shahid's evaluation on evidentiary grounds would have been successful.

As a preliminary matter, it is undisputed that Dr. Shahid's evaluation, among other facts and data, provided a basis for the testimony of the two expert witnesses in this case.[79] Furthermore, MRE 703 provides, "The facts or data in the particular case upon

---

[78] *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000) ("Trial counsel is not required to advocate a meritless position."); see also *People v Riley (After Remand)*, 468 Mich 135, 142; 659 NW2d 611 (2003).

[79] It is also undisputed that the two expert witnesses in this case were qualified to give testimony pursuant to the requirements of MRE 702. These requirements would only be relevant to Dr. Shahid if he were "a witness" who "testif[ied] . . . in the form of an

which an expert bases an opinion or inference shall be in evidence."[80]  However, even though such facts and data "shall be in evidence," they might be subject to our evidentiary rules regarding hearsay.[81]

"Hearsay is not admissible except as provided by" our evidentiary rules,[82] which define "hearsay" as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

---

opinion . . . ."  MRE 702.  Because I conclude that Dr. Shahid's evaluation was not testimonial, MRE 702 is inapplicable to whether his *evaluation* would be admissible under our hearsay rules.

[80] Contrary to the majority's conclusion, an expert may form his opinion "on historical data, *including* information and *opinions* contained in prior competency evaluations, when forming an opinion regarding a defendant's criminal responsibility."  *People v Dobben*, 440 Mich 679, 698; 488 NW2d 726 (1992) (emphasis added).  Thus, the fact of Dr. Shahid's diagnosis was one of several pieces of data contained within his evaluation and would not have to be redacted under MRE 703, as the majority suggests.  Moreover, even if Dr. Shahid's diagnosis that defendant did not suffer from psychosis had not been a basis for the defense expert's witness, the rule of completeness, MRE 106, would have required that the entire evaluation be introduced into evidence because it "ought in fairness . . . be considered contemporaneously with" the rest of the evaluation.

[81] Although the *Dobben* Court ruled that "[a]n expert witness may also base his opinion on hearsay information," *id.* at 695-696, I note that this Court last interpreted the intersection of our hearsay rules with MRE 703 before the 1995 and 2003 amendments of MRE 703.  Before these amendments, MRE 703 provided, in relevant part, "The court *may require* that underlying facts or data essential to an opinion or inference be in evidence."  402 Mich cx (1978) (emphasis added).  Thus, before the amendments, MRE 703 gave the trial court discretion whether to require that the facts and data underlying an expert opinion be admitted into evidence.  Because I conclude that an exception to the hearsay rules allows for the introduction of Dr. Shahid's evaluation, I need not determine whether that portion of *Dobben* remains viable in light of the amendments of MRE 703, and I would leave that determination to another day.

[82] MRE 802.

asserted."[83]  It is uncontested that Dr. Shahid's evaluation is "a statement, other than the one made by the declarant while testifying at the trial or hearing . . . ."[84]

Assuming for the sake of argument that the prosecutor's purpose for referring to Dr. Shahid's evaluation in closing was, in substantial part, to use it to prove the truth of the matter asserted,[85] MRE 803(6), the business records exception, nevertheless, allows introduction of "[a] memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge . . . ."  As a diagnosis of defendant's psychiatric condition, Dr. Shahid's evaluation falls squarely within this exception and therefore was admissible into evidence.

---

[83] MRE 801(c).

[84] However, defendant's statements contained within Dr. Shahid's evaluation are not hearsay-within-hearsay because they are defendant's *own* statements.  MRE 801(d)(2)(A).  Moreover, even if they are hearsay, they are "[s]tatements made for purposes of medical treatment," MRE 803(4), and are therefore not excluded by the hearsay rule.

[85] Although the prosecutor asserted in closing argument that "it's real important to look at what Dr. Shahid had to say," the prosecutor's initial use of Dr. Shahid's evaluation was to impeach the credibility of defendant's expert witness and the prosecutor's direct examination of his expert witness sought to explain the foundation of his expert's opinion.  As stated earlier in this opinion, even if the prosecutor sought to use the evidence to prove the truth of the matter asserted in his closing argument, the trial court's instruction to the jury that  "[t]he lawyers' statements and arguments are not evidence," that "[t]hey're only meant to help you understand the evidence and each side's legal theories," and that the jury "should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge" properly insulated the jury from any inappropriate use of Dr. Shahid's evaluation during closing argument.

The majority correctly observes that MRE 803(6) also requires authentication by "the testimony of the custodian or other qualified witness . . . ."[86] However, the majority entirely overlooks the fact that *defendant* was required to admit Dr. Shahid's evaluation into evidence in the first instance, since defendant's expert admitted that Dr. Shahid's evaluation comprised, in significant part, the "facts and data" on which he based his opinion.[87] Moreover, defendant does not dispute the authenticity of Dr. Shahid's evaluation, even on appeal. Since his own expert first relied on the evaluation, defendant can hardly (certainly not legitimately) claim that when it was used in rebuttal, the evaluation became inauthentic. Thus, this case does not even present a situation in which defendant simply failed to object to the authenticity of Dr. Shahid's evaluation; rather, defendant *affirmatively endorsed* its authenticity because his own expert relied on it in forming his opinion, which was the foundation of the insanity defense. Under such circumstances, defendant cannot receive relief on the basis of authentication error.[88]

---

[86] MRE 803(6) refers to the custodian's role to testify regarding whether the business record was "kept in the course of a regularly conducted business activity" and whether it "was the regular practice of that business activity to make the memorandum, report, record, or data compilation . . . ." It does not refer to additional questions that the majority raises, such as those questions regarding the substance of Dr. Shahid's evaluation: whether psychiatric evaluations compiled in the regular practice of treating patients "often refer to a patient's pending criminal charges" or whether doctors creating those evaluations "typically review other materials, such as police reports . . . ." *Ante* at 20 n 15. These questions appear to be outside the scope of what a custodian of records would be expected to know and certainly beyond the scope of MRE 803(6).

[87] MRE 703.

[88] This dissent does not suggest that the authentication requirement must "be stricken from" MRE 803(6), *ante* at 19 n 15. Rather, this dissent concludes that any failure to authenticate Dr. Shahid's evaluation cannot inure to defendant's benefit because his own expert admitted using Dr. Shahid's evaluation in forming his own expert opinion and,

35

## D. TRIAL STRATEGY

Even if I were to conclude that trial counsel erred by failing to raise a Confrontation Clause or hearsay objection to Dr. Shahid's evaluation (which I do not), before granting defendant relief, the Court must also determine whether that failure constituted an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[89] In undertaking this inquiry, *Strickland* made clear that a defense counsel's trial strategy must be given deference because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."[90] The Court explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[91]

Instead, reviewing courts must "evaluate the conduct from counsel's perspective at the time," and defendants must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[92]

---

therefore, the evaluation was required to be placed into evidence by *defendant* pursuant to MRE 703. Simply put, defendant cannot benefit from his own failure to introduce the evaluation.

[89] *Strickland*, 466 US at 687.

[90] *Id.* at 689.

[91] *Id.*

[92] *Id.*, quoting *Michel v Louisiana*, 350 US 91, 101; 76 S Ct 158; 100 L Ed 83 (1955).

To begin with, defendant's trial strategy was to raise the defense of insanity rather than contest the factual elements of the charged crimes. Although the prosecutor must prove the factual elements of the charged crimes beyond a reasonable doubt, the *defendant* bears the burden of proving insanity by a preponderance of the evidence.[93] In this case, defendant's trial counsel stated at the *Ginther* hearing that he did not object when the prosecutor first cross-examined defendant's expert witness about Dr. Shahid's evaluation because he "didn't want to call attention to" it, which would have undermined the insanity defense. Moreover, counsel also stated that he "had a discussion as to whether or not to even present Dr. Shahid" but explained that "the concern was that he would have been a bad witness if everything in that [evaluation] would have come out, and it would have hurt rather than helped" defendant's insanity defense.[94]

Defense counsel thus had a dilemma: his own expert had relied on portions of Dr. Shahid's evaluation to establish his own opinion that defendant was legally insane, but the *entire* evaluation was harmful to the insanity defense. According to the defense expert, he agreed with all of Dr. Shahid's evaluation *except* his conclusion that the defendant had not suffered a break with reality when he committed the crimes.

---

[93] MCL 768.21a(3).

[94] Presumably, this potentially damaging testimony would have included issues that the majority is curious about, such as whether Dr. Shahid's "rationale [would not be] viewed as compelling," whether "his diagnosis of 'no psychosis' did not necessarily mean that defendant was not legally insane at the time of the incident," whether "the prosecutor's expert had misinterpreted his diagnosis," or whether "he . . . just [would have been] an ineffectual witness[.]" *Ante* at 47 n 41. Notwithstanding the majority's curiosity, one thing is certain: defense counsel did not want the jury to hear Dr. Shahid's answers to these questions.

37

Accordingly, counsel, after apparent consultation with defendant, made a *conscious decision to downplay Dr. Shahid's evaluation.* Given that the evaluation contained information detrimental to his client's defense—particularly the conclusion that defendant was not suffering from psychosis and was thus legally sane—I cannot conclude that this trial strategy was objectively unreasonable. To the contrary, defendant's strategy may have represented the best strategy possible: defendant was allowed to rely on favorable portions of Dr. Shahid's statement as the basis for his insanity defense while avoiding having Dr. Shahid take the stand to explain his finding of "no psychosis," which could have completely undercut defendant's proffered defense. Indeed, this defense trial strategy proved partially successful; the jury found defendant guilty but mentally ill. The majority ought to explain why this strategy should not be given the deference *Strickland* requires.

Defendant now claims that the failure to call Dr. Shahid to the witness stand violated his rights under the Confrontation Clause, and the majority treats this failure as if it were an omission. It has been made clear that this was not an omission, but a conscious strategy that defendant's trial counsel employed.[95] When properly considered as a conscious decision to avoid calling as a witness an expert that counsel reasonably thought

---

[95] The majority makes much of defense counsel's claim at the *Ginther* hearing that he did not consider the references to Dr. Shahid's evaluation a confrontation violation. To begin with, counsel did not err in failing to recognize a confrontation violation *because there was no confrontation violation to recognize*. But even if defendant had a right to confront Dr. Shahid, defense counsel's unequivocal trial strategy sought to downplay Dr. Shahid's opinion of defendant's mental state and in fact resulted in the affirmative decision *not* to call Dr. Shahid as a witness.

would have been "a bad witness," defendant's claim of error seems to be the very danger that the *Strickland* Court warned against: allowing defendant to "second-guess counsel's assistance after conviction or adverse sentence . . . ."[96] The majority compounds this problem by "examining counsel's defense after it has proved unsuccessful, [and] conclud[ing] that a particular act or omission of counsel was unreasonable."[97] Because I do not believe that this Court should reward defendants for pursuing a reasonable trial strategy then using it as an appellate parachute, I also dissent on this alternative basis from the majority's conclusion that defense counsel rendered objectively unreasonable assistance of counsel.[98]

The majority explains that, because "insanity is an affirmative defense with respect to which a defendant carries the burden of proof,"[99] defendant had no choice but to open the door to questioning about his mental state through expert testimony. Moreover, the majority explains that "[n]o such [expert] witness could have neglected altogether to mention the existence of the report of the only person who actually interviewed defendant in the immediate wake of his conduct."[100] Precisely! These

---

[96] *Strickland*, 466 US at 689.

[97] *Id.*

[98] Because I conclude that defense counsel did not render constitutionally deficient assistance of counsel by failing to object to the use of Dr. Shahid's evaluation on Confrontation Clause grounds, I need not engage in the second prong of the *Strickland* ineffective assistance analysis: the potential prejudicial effect of the claimed error. Accordingly, I neither agree nor disagree with the majority's analysis regarding whether the alleged confrontation error resulted in prejudice requiring reversal.

[99] *Ante* at 27; see also MCL 768.21a(3).

[100] *Ante* at 27-28.

observations prove just how completely the majority fails to understand basic impeachment and reinforce just how appropriately strategic was defense counsel's decision *not* to call Dr. Shahid as a witness. It would appear that the majority believes that no impeachment of the defense expert could have occurred under these circumstances unless the prosecutor called Dr. Shahid as it own witness. If the Confrontation Clause can properly be read to require this result, then *Crawford* will seem a tiny shift compared to the seismic destruction that this new majority rule will require.

There is no question that Dr. Shahid's evaluation contained statements that any expert would have had to take into account when forming an opinion regarding defendant's mental state. As explained previously, the evaluation also revealed inconsistencies concerning what defendant remembered about the afternoon in question, inconsistencies that *any* expert witness would have had to resolve. Yet precisely because the defense expert was silent about these inconsistencies, the prosecutor cross-examined him regarding his selective use of the evaluation. The majority would raise this strategic silence to a constitutional level and insulate the expert from such cross-examination. I would not hamstring the impeachment of an expert witness in such a way.

## IV. CONCLUSION

Because Dr. Shahid's evaluation was initially used by the defense as a part of its legitimate trial strategy to establish its insanity defense, the prosecutor's use of that same evaluation in rebuttal cannot constitute a Confrontation Clause violation. The majority's conclusion to the contrary rewards a clever appellate parachute strategy.

Secondarily, Dr. Shahid's evaluation was a "medical report[] created for treatment purposes . . . ."[101] United States Supreme Court precedent could not be clearer that the Confrontation Clause did not prohibit introduction of the evaluation into evidence. The majority's failure to apply the Supreme Court's Confrontation Clause doctrine can only cause further confusion in an already confusing area of law. Accordingly, I would hold that the prosecutor's use of Dr. Shahid's evaluation did not violate defendant's constitutional right to confront the witnesses against him. Furthermore, the evaluation was admissible under the business records hearsay exception, and defense counsel's failure to object to the prosecutor's use of the evaluation did not render his assistance constitutionally ineffective, nor was his trial strategy to downplay Dr. Shahid's evaluation objectively unreasonable. Accordingly, I would affirm the judgment of the Court of Appeals and affirm defendant's convictions.

Robert P. Young, Jr.
Brian K. Zahra

---

[101] *Melendez-Diaz*, 557 US at ___ n 2; 129 S Ct at 2533 n 2.

41

APPENDIX

47-year-old Caucasian married male was referred by Rescue Crisis Mental Health Services with an emergency application indicating that the patient's son was killed eight months ago in a traffic accident, and the patient drove to the man's home with a gun who patient felt was responsible for the death of his son. Patient has severe depression and had suicidal thoughts to overdose. The emergency application also indicated that the Monroe County sheriff wants to be called when the patient is discharged to home.

**HISTORY OF PRESENT ILLNESS:** Patient stated that he had been feeling down and depressed since June of 2006 after his 17-year-old son was killed in an auto accident. Patient stated that his son was riding with other individuals in the car and somebody chased his son's car, and as a result there was an accident and his son was killed in that accident. Patient complains of feeling sad, blue, down and depressed. Complains of poor sleep, poor appetite, poor concentration and low energy. Feels worthless and has feelings of guilt. Patient states he just feels empty inside. Has feelings of hopelessness. Patient stated that he thinks about suicide "all the time." At the present time, patient does not have any active plan of killing himself. Patient stated that after his son was killed, he took an overdose of pills that he had over-the-counter. The patient stated at that time, he informed his primary care physician and was started on Prozac 20 mg daily that was later on increased to 40 mg daily. Patient stated that prior to this admission, he went to the person who he believes was responsible for his son's death and, "I wanted him to feel my pain." Patient states that during the legal trial and otherwise, the person who patient believes was responsible for the death of his son has not shown any remorse, and this makes patient very angry. The patient stated that he remembers stopping his car and seeing that person who the patient believes was responsible for his son's death and stated that that person took off in the street and, "I followed him across the street." Patient states, "I do not remember driving to Michigan and driving to his house. I do not remember what happened, and the only thing I remember is that I saw a terrified look on that man's face, and at that time I felt I just woke up and started apologizing to that man." The patient stated that he went back to his car and drove away and stated that he stopped at his mother's house, and he believes that he left the gun that he had with him at his mother's house. Patient stated that he had a handgun for years and years that he kept in a dressing drawer in his bedroom. The patient states he does not remember taking the gun out of the drawer when he went to that person's house in

42

Michigan. When I asked him about if there were bullets in the gun, patient states he does not remember, but he thought that he had bullets in his pocket and stated that he believes that he flushed the bullets down the toilet or he believes that he threw his bullets away.

Patient stated that since the death of his son on June 5, 2006, "My whole life has been torn apart," then patient went on to say that on Tuesday he went to his son's school, Whitmer High School, where his friends were playing baseball and states that he watched the baseball game, but all the time when he was watching the baseball he missed his son and stated the school team won, and when he left the playground he was just in tears and he was feeling sad, and then he believes that while going to the game, brought a lot of memories back to him and his feeling of loss got more intensified.

**PAST PSYCHIATRIC HISTORY:** Denies previous psychiatric treatment. As mentioned above, patient did take an overdose after the death of his son, then he was started on Prozac by his primary care physician.

**MEDICAL HISTORY:** [Redacted.]

**FAMILY HISTORY:** [Redacted.]

**SOCIAL HISTORY:** [Redacted.] Denies abusing drugs or alcohol, except since the death of his son he had been drinking more heavily "to numb myself." Patient described his spiritual life that he used to believe in God but "not anymore. If there is a God, why did he give me my son and then took it away. I used to pray but not anymore." Patient stated that he goes to church to support his wife.

**MENTAL STATUS EXAMINATION:** Patient looks of his stated age, not in any acute physical distress. Mood is dysphoric, and affect is depressed. Temperature 97.7. Pulse 85. Respirations 16. Blood pressure 126/79 on admission. Today, patient's temperature is 97.2. Pulse 81. Respirations 18. Blood pressure 141/95. Patient feels helpless, hopeless and worthless. The patient has suicidal thoughts but denies any active plans of hurting himself. Initially, patient was admitted to the adult closed unit but was transferred to the psychiatric intensive care unit for his safety since the patient was thinking intensely about suicide, and he just does not want to live anymore. Patient feels hopeless, helpless and worthless. Has marked feelings of anger and guilt. Oriented to time, place and person. Recent and remote memory is intact, and intelligence is normal. Speech is relevant and goal-oriented. During most part of this interview, patient was crying and sobbing. He is denying auditory or visual hallucinations but

43

states that after the death of his son, "I was smelling things and I felt things crawling under my skin, but not anymore." Attention and concentration are extremely poor. Patient states, "My mind is going all the time. I cannot shut up my mind. I am thinking about my son all the time." At the present time, patient is denying any homicidal thoughts or plans. I specifically asked the patient if he wants to kill the person that he feels is responsible for the death of his son, and patient stated, "I just feel sorry for him. I am not thinking of killing him." Patient has suicidal thoughts but does not have any active plan of hurting himself. Patient has been admitted to the psychiatric intensive care unit for his safety.

**STRENGTHS AND LIMITATIONS:** Patient has supportive family and is employed, which is a strength. Loss of son is the limitation.

**ESTIMATED LENGTH OF STAY:** 10-14 days.

**DIAGNOSIS:**

Axis I: Major depression, single episode, severe without psychosis.

Axis II: Deferred.

Axis III: Hyperlipidemia.

Axis IV: Severe (loss of son).

Axis V: GAF 20.

**PLAN:**

Continue Prozac, and I will add Seroquel. Off-label use of Seroquel was discussed with the patient. Seroquel is added to help patient with sleep, agitation and his complaint that he cannot shut his mind. Side effects, risks versus benefits of treatment with psychotropics and alternatives to the treatment were discussed with the patient. Risk of not receiving any treatment was also discussed with the patient. After discussion, we mutually decided to continue with the current treatment.

Supportive psychotherapy.

Unit milieu.

After discharge, patient to follow at the Community Mental Health Center or a psychiatrist of his choice.

Patient also has legal charges against him through the State of Michigan 38th Judicial Circuit, and count one is home invasion, first degree, and count two is assault with a dangerous weapon (felonious assault).

[signed] Agha Shahid, M.D., 3/31/7

45